**VIRGINIA GREENSTONE COMPANY,**
Incorporated, Appellee,

v.

**UNITED STATES of America,**
Appellant.

No. 8577.

United States Court of Appeals
Fourth Circuit.

Argued June 4, 1962.

Decided Sept. 24, 1962.

Melva M. Graney, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice; Thomas B. Mason, U. S. Atty., and Lawrence C. Musgrove, Asst. U. S. Atty., on brief), for appellant.

Frank G. Davidson, Jr., Lynchburg, Va. (Lapsley W. Hamblen, Jr., and Caskie, Frost, Davidson & Watts, Lynchburg, Va., on brief), for appellee.

Before SOPER, HAYNSWORTH and BELL, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The question is the basis for the computation of the depletion allowance for income tax purposes for this miner-manufacturer of dimension stone. The District Court held that sand finished stone, cut to the dimensions specified by the customer, is the first marketable product of the quarry and that depletion should be computed on the basis of the gross income from the sale of such stone. We think gross income from the sale of quarry block, as contended by the Commissioner, is the proper basis.

In Lynchburg, Virginia, the taxpayer mines, cuts and finishes greenstone for use as ornamental or dimension stone. The dressing or finishing plant is approximately a mile and a quarter from the quarry, and, during the years in question, all of the quarry blocks extracted from the mine were cut and finished in the finishing plant.

Greenstone is an actinolite-chlorite schist. By channeling and drilling, it is removed in large blocks from the quarry. These quarry blocks are transported by truck to the finishing plant. There, gang saws cut each block into slabs of the desired thickness usually varying, according to customer specification, between $\frac{7}{8}$ths of an inch and $1\frac{1}{4}$ inches. The slabs are then cut to specified lengths and widths, after which their surfaces are smoothed and finished by sand rubbing.

The slabs of stone, thus precisely dimensioned as to length, width and thickness and finished, are known as

sand finished greenstone. Some orders require further polishing, honing and buffing of the surfaces of the slabs. Some of the orders require notching and drilling of the slabs and some require that letters and numerals be carved into the outside surface of some slabs. Substantial orders are received for sand finished greenstone, without further polishing, notching, drilling or carving, however, and the taxpayer contends that such stone is its first marketable product.

Greenstone, so dimensioned and finished, is used as a veneer stone on and in buildings. Orders are received by the taxpayer as a result of a specification of greenstone by an owner or an architect. They are accompanied by detailed specifications of the dimensions and the surface finishing processes which are desired. Thus all finishing operations are geared to the requirements of particular customers.

The taxpayer, of course, seeks to promote the use of greenstone rather than other dimension stone, such as marble or granite, with which it competes. This it does, in the main, through contacts with architects and engineers, the color being the principal selling point.

There is no other producer of greenstone in the United States. Since the taxpayer is the sole producer of such stone and actively promotes its use, it is not surprising that it is the recipient of the greenstone orders, and that in the years in question it sold no quarry block to others. On infrequent occasions, it received inquiries about the sale of quarry block for processing in other dressing plants, but these were insignificant in the quantity of material involved. Plainly, there was no active market for Greenstone quarry blocks.

It does not follow, however, that the taxpayer could not have marketed its quarry block had it sought to do so. Some other finisher of dimension stone might well become a most willing purchaser of greenstone quarry block if given an exclusive arrangement and freedom from competition by the taxpayer's finishing plant. So long as the taxpayer operated as it did, no other finisher could afford the expense of promoting and selling greenstone, and was unlikely to receive an order for it. Thus, there was reference to the Alberene Stone Company, another integrated Virginia producer of dimension stone, but its stone was soapstone and serpentine. It promoted its own products, as the taxpayer promoted the use of greenstone, and neither was interested in promoting the competing product. So long as they were in competition for the sale of their finished products, neither was a potential purchaser of substantial quantities of the other's quarry block. As the taxpayer's president put it, one would not likely be able to sell a truck load of new Fords to a Chevrolet dealer.

For all that appears, therefore, the absence of an active market for greenstone quarry block is attributable to the taxpayer's volition. It controlled the only source of supply, and it was in active competition in the finished products market with producers of other dimension stones. Had it been willing to sell its finishing plant to some entrepreneur and to supply his requirements of quarry block, the quarry block might have been readily marketable.

The testimony discloses that there are many producers of dimension stone which are integrated as is the taxpayer. However, there are many unintegrated quarries producing quarry block for sale to finishing plants. Thus it is clear that integrated producers of other dimension stones, such as marble and granite, must treat their quarry block as the marketable product of the mine, and that is true whether or not the particular producer could profitably dispose of his quarry block.[1] The taxpayer contends, however, that because its product is unique, produced only in its own quarry, the existence of markets for other dimension stone quarry blocks is irrelevant. In effect, it contends that it is a separable

1. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581.

industry—the greenstone dimension stone industry and that its practices, for it is the industry, alone are relevant.

Mining operations, for income tax purposes, are entitled to percentage depletion based upon the gross income from the property at specified rates, though the allowable depletion may not exceed 50% of net taxable income from the property computed without a depletion deduction.[2] By definition, mining includes not only the original extraction of ores but "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *." The statute contains a list of processes which the Congress considered "ordinary treatment processes normally applied by mine owners." The list contains no reference to the finishing of dimension stone, but the list is nonexclusive. The list, however, indicates the kind of things the Congress regarded as ordinary treatment processes. Generally, they appear to be processes appropriate for the miner and necessary for the production of a product which may be shipped to a manufacturer for further refining, processing, molding or fabrication.

Percentage depletion for the extractive industries has a long history, so often reviewed it need not be recounted here.[3] It discloses a liberal congressional approach to the allowance of the deduction and to the inclusion of related processes within the compass of the favored mining operations. This fact led to decisions that integrated miner-manufacturers were entitled to percentage depletion on the basis of the gross income from the sale of the first marketable product of the manufacturing processes if there was no active market in which the product of the mine could be profitably sold

without conversion into manufactured products.

That approach was halted by the decision of the Supreme Court in United States v. Cannelton Sewer Pipe Co.[4] The taxpayer there was an integrated miner of fire clay and shale and a manufacturer of sewer pipe and other vitrified products. Fire clay and shale from strip mines was bought and sold in the area, but Cannelton's deposits were deep. The quality of its clay and shale was said to be exceptionally good, but its underground extraction was so expensive that Cannelton could not profitably dispose of it on the basis of established prices for clay and shale from strip mines. It claimed, therefore, that its first marketable product of its mine was its finished, manufactured product.

Cannelton's claim was rejected by the Supreme Court. It held that the statute required a distinction between mining and related processes, on the one hand, and manufacturing processes on the other. Cannelton's operation was treated as though, as miner, it had sold its extracted clay and shale to itself, as manufacturer, and its depletion base was held to be the gross income it constructively received from itself for the clay and shale.

Since Cannelton controls our conclusion, we need not be concerned with pre-Cannelton cases which may seem to point the other way. It is now settled that if a taxpayer is engaged in an integrated mining-manufacturing business, the depletion base is dependent upon a determination of the point at which mining and the ordinary treatment processes normally applied by mine owners cease and manufacturing begins.

In Commissioner of Internal Revenue v. Halquist, 7 Cir., 291 F.2d 49, it has recently been held that the operation of

2. Internal Revenue Code of 1954, § 613, 26 U.S.C.A. § 613.

3. See, e. g., United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581; Dragon Cement

Company v. United States, 1 Cir., 244 F.2d 513; Riddell v. Monolith Portland Cement Co., 9 Cir., 301 F.2d 488.

4. 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581.

a dimension stone finishing plant is manufacturing, not mining nor an ordinary process normally applied by miners. Halquist extracted dimension stone in large slabs from his quarry. In his finishing plant these slabs were cut, proportioned and processed for use as veneer dimension stone. Because there was a loss of 40% to 50% of the weight in the finishing process, it was not economically feasible to ship uncut stone, and, there being no other finishing plants nearby, the taxpayer contended that his finished dimension stone was the first marketable product of his quarry. Following Cannelton, the court rejected the contention. Since there were no area sales of uncut stone like Halquist's, the court turned to the general practices in the dimension stone industry for guidance in determining where Halquist's mining ended and his manufacturing began.

It did appear in Halquist that, where large blocks of dolomite from the same general formation worked by Halquist, were available, they were extracted and sold as quarry block, but Halquist had no such large blocks available. His uncut stone had physical properties which made it uneconomic to transport it to any other finishing plant.

Recently, we had occasion to consider ordinary treatment processes normally applied by mine owners.[5] A quarry, from which very large blocks of granite for monumental use were extracted, was fourteen miles from the nearest railroad of a common carrier. The quarry and the carrier were connected by a private railroad over which the stone moved. The stone was sold f. o. b. the carrier's station, and would have been unmarketable but for the maintenance and operation of the private rail line. We held that the cost of transporting the blocks to the railhead was not a part of the mining, nor was it an ordinary treatment process normally applied by miners.

Whatever may be said of the result reached in Riddell v. Monolith Portland Cement Co., 9 Cir., 301 F.2d 488, in the light of Cannelton, the holding in Riddell is not persuasive here. In holding that cement was the first marketable product of the cement rock quarry, the court emphasized the fact that all cement producers were integrated and none of them were in the market for crushed cement rock extracted from independent quarries.[6] Here, in contrast, it is clear that quarry block is a marketable product in the dimension stone industry, viewed as a whole.

What the taxpayer sells is the finished, manufactured product. When shipped by the taxpayer, it is ready for installation by stonesetters without further processing or treatment. The record discloses that dimension stone dressing plants, such as the taxpayer's, are classified by the Bureau of the Census of the Department of Commerce as manufacturing plants. Since many such plants are operated independently of any quarry and since many quarries produce and sell quarry block which others convert into dressed dimension stone, the classification is realistic and appropriate. The quarry block is the marketable product of the dimension stone quarry, being then fit for industrial use and further processing in the manufacturing plants, while the finished, dressed dimension stone is the marketable product of the manufacturing plant.

The taxpayer, of course, would avoid the thrust of this approach if its operations were considered in isolation. It contends they should be, because the stone in its quarry has unique chemical composition and coloration. Thus it says that whatever it does is normal and ordi-

5. Winnsboro Granite Corporation v. Commissioner, 4 Cir., 283 F.2d 307.

6. Cement rock is a high grade limestone. It does not clearly appear from the court's opinion that crushed cement rock could have been sold for some other end use than the manufacture of cement. If it could, though such disposition was not economically advantageous, Cannelton would seem to require a different result.

nary for the industry for it is the sole representative of the industry.

The contention is unacceptable. The cogent fact is that the taxpayer is in direct competition with other producers of dimension stone. Though their products may be classified as marble, granite or other stone, not as greenstone, every variation in the physical or chemical properties of the material or in color does not require that its producer be treated as an isolated industry or that the practices of those in direct competition with it be disregarded. These differences in the materials do not alter the processes required to produce the finished product—dimension stone ready to be set and used; they furnish no rational basis for more favorable tax treatment of one competitor than another.

The statute should be applied on the basis of objective standards. The required determination of the ordinary treatment processes normally applied by miners, should not be converted into a subjective ascertainment of the practices, voluntarily undertaken, of a particular taxpayer. Unless variations in the materials, or in other factors, occasion variations in processes and procedures, miners in direct and immediate competition should be required to compute percentage depletion on the basis of a determination of those treatment processes which are normal and ordinary as to all of them. The dimension stone industry need not be so fragmented that different standards should govern allowable depletion deductions because the product of one taxpayer is pink while that of another is green.

This seems the plain teaching of the Cannelton case. What this taxpayer has done is not controlling. The court must distinguish between what is mining within the meaning of the statute and what is manufacturing. That task is approached in the light of the practices of the industry of which the taxpayer is a part, and those industry practices are not made irrelevant by differences in the color or composition of the product when those differences do not require or result in variations in the treatment processes associated with mining.

Upon the undisputed facts, we conclude that the quarry blocks were the marketable product of the mine which were then fit in all respects for industrial use in the dressing plant, where manufacturing operations are conducted, the processes of which were not normal to the operation of comparable quarries nor ordinarily applied by comparable quarry operators. The result is that the taxpayer must be regarded as having sold the quarry blocks to itself and is required to compute allowable percentage depletion on the gross income constructively received upon such sales.

Reversed.