UNITED STATES of America,
Appellant,

v.

LIGHT AGGREGATES, INC., Appellee.

No. 17694.

United States Court of Appeals
Eighth Circuit.

April 6, 1965.

Melva M. Graney, Atty., Tax Division, Dept. of Justice, Washington, D. C., made argument for appellant and filed brief with Louis F. Oberdorfer, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Harold C. Doyle, U. S. Atty., and Travis H. Lewin, Asst. U. S. Atty., Sioux Falls, S. D.

George A. Bangs, of Bangs, McCullen, Butler & Foye, Rapid City, S. D., made argument for appellee and filed brief.

Before VAN OOSTERHOUT, MATTHES and MEHAFFY, Circuit Judges.

MATTHES, Circuit Judge.

At issue in this case is the amount of depletion allowance to which Light Aggregates, Inc. (Taxpayer) is entitled for the shale it mined in the fiscal years ending February 28, 1959, 1960 and 1961.

The basic facts are not in controversy. Taxpayer, a South Dakota corporation, is engaged in the manufacture of lightweight aggregate for concrete construction purposes. Its product is sold under the name of "Heydite." The raw material is a shale, referred to by some of the witnesses as a "mud" or "South Dakota gumbo." The shale is suitable for the making of lightweight aggregate because of its expanding or bloating propensity when subjected to high temperatures. Taxpayer removes or mines the shale itself by an open pit process which involves "scraping off the overburden, loosening the clay * * *," running it over a "grizzly" to take out large rocks and other foreign materials, loading it onto trucks and transporting it about 11 miles to Taxpayer's plant.

The processing of the shale consists of passing it through a rotary kiln 8 feet in diameter and 90 feet long under a temperature of 2,000°. The heat causes the shale to expand or bloat about one-third of its original dimension and it becomes a "sort of clinker." A crushing and screening process follows which reduces the product to the proper size for concrete work. In its finished state, the aggregate is used to make light concrete block and lightweight concrete.

The depletion allowance statutes applicable here are §§ 611(a), 612, and 613 of the 1954 Internal Revenue Code. Section 611(a) authorizes the allowance which is to be computed by use of the cost method provided for in § 612 (not applicable here), or the percentage depletion method authorized by § 613. Under § 613 the allowance for "shale" is 5% of the gross income from the property. Gross income is defined to mean "gross income from mining," and the term "mining" includes "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *." § 613 (c) (2).

Taxpayer filed its returns for the fiscal years ending February 28, 1959 and 1960 on the theory that it was entitled to a depletion allowance of 5% of its sale price of the light aggregate, or finished product. The Commissioner took the position, and still does, that the cut-off point to "mining" was immediately prior to the kiln process, and computed the depletion allowance accordingly.[1] This resulted in a deficiency that was assessed and subsequently paid by Taxpayer. For the year ending February 28, 1961, Taxpayer claimed depletion on a reduced basis, but later filed a claim for refund, asserting as it did for the years 1959 and 1960, that the cut-off point was after the shale had been processed into the light aggregate.

This suit was commenced after the Commissioner had denied all claims for refund. The District Court adopted Taxpayer's theory, holding, in effect, that "mining" of shale includes all of the processes applied by Taxpayer and that Taxpayer was entitled to a depletion allowance of 5% of its sales of the finished product. The Court's opinion is reported at 225 F.Supp. 253 (Dec. 21, 1963). From the judgment entered in favor of Taxpayer, the Government appealed.

The Government contends that the District Court fell into error in holding that the burning of the raw shale in a rotary

---

1. In determining the amount of the deficiency, the Commissioner used the proportionate profits method authorized by Treasury Regulations 118 (1939 Code), § 39.23(m)–1(e). The Regulation provides that where, as here, the taxpayer does not sell the mineral at the cut-off point, the representative market price of the product is used, if there is such a price. If not, a proportionate profits formula is used. The method employed by the Commissioner is not in issue here.

kiln and the subsequent crushing and grinding processes are a part of "mining" as defined in § 613(c)(2) of the 1954 Code. Taxpayer counters with the assertions, (1) that the "finished" light aggregate is the first and only "commercially marketable mineral product" obtained by it from its mining property; (2) that the rotary kiln treatment is an ordinary treatment process normally applied by mine owners in order to obtain the commercially marketable product.

█ We agree that the evidence does show that there were no actual sales of the unprocessed shale by Taxpayer to others and in that sense there was no available market.[2] But the Supreme Court has unequivocally held and established that actual sales are not a prerequisite to commercial marketability.

United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960) also involved fire clay and shale. The record there disclosed that three-fifths of the fire clay produced in Indiana in 1951 was sold in the raw state, but the Court's decision did not turn on this factor. Rather the Court regarded the substantial sales of the raw clay or shale as providing "conclusive proof that, when extracted from the mine, the fire clay and shale are in such a state that they are ready for industrial use or consumption—in short, they have passed the 'mining' state on which the depletion principle operates." Id. at 86, 80 S.Ct. at 1587. The taxpayer also asserted that its miner-manufacturer status made some difference. The Court disagreed, stating, "Ever since the first percentage depletion statute, the cut-off point where 'gross income from mining' stopped has been the same, i. e., where the ordinary miner shipped the product of his mine. * * * As we see it, the miner-manu-

facturer is but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned."[3] Id. at 87, 80 S.Ct. at 1587. The taxpayer further contended that it was required to utilize the fabrication processes in manufacturing sewer pipe in order to obtain a "commercially marketable mineral product or products," pointing out that its underground method of mining prevented it from selling its raw fire clay and shale. This prompted the Court to observe "[t]his position leads to the conclusion that respondent's mineral product has no value to it in the ground. If this be true, then there could be no depletion. One cannot deplete nothing." Id. at 88, 80 S.Ct. at 1587.

In Riddell v. Monolith Portland Cement Co., 301 F.2d 488 (1962) the Ninth Circuit held that cement was a commercially marketable mineral product for depletion allowance purposes. The Supreme Court summarily reversed, 371 U.S. 537 (1963), stating at pp. 538 and 539, 83 S.Ct. 378, 379, 9 L.Ed.2d 492:

"In United States v. Cannelton Sewer Pipe Co., 364 U.S. 76 [80 S. Ct. 1581, 4 L.Ed.2d 1581] (1960), we considered at some length the application of this term [mining] to the mining industry and held that the statutory percentage depletion allowance on the gross income of an integrated mining operator should be cut off at the point where the mineral first became suitable for industrial use or consumption. * * * We found that the 'cut-off point where "gross income from mining" stopped has been the same' ever since the first depletion statute, namely, 'where the ordinary miner shipped the product of his mine.'"

The teachings of the Supreme Court in Cannelton have been adhered to in

2. The evidence developed that in the "miscellaneous clay" area which includes shale utilized for light aggregates, only about 3 per cent of the total national production is sold by producers in its raw state and none is sold in South Dakota and surrounding states.

3. At page 89 of 364 U.S., page 1588 of 80 S.Ct., the Court stated: "We believe that the Congress intended integrated mining-manufacturing operations to be treated as if the operator were selling the mineral mined to himself for fabrication."

Virginia Greenstone Company v. United States, 308 F.2d 669 (4 Cir. 1962); [4] Morton Salt Company v. United States, 316 F.2d 931 (Ct.Cl.1963), cert. denied 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963); United States v. Longhorn Portland Cement Company, 328 F.2d 491 (5 Cir. 1964); C. I. R. v. Hallquist, 291 F.2d 49 (7 Cir. 1961), cert. denied 368 U.S. 930, 82 S.Ct. 367, 7 L.Ed.2d 193 (1961); Standard Realization Company v. United States, 289 F.2d 247 (7 Cir. 1961); United States v. Portland Cement Company of Utah, 338 F.2d 798 (10 Cir. 1964); Riddell v. California Portland Cement Co., 297 F.2d 345 (9 Cir. 1962); Riddell v. Victorville Lime Rock Co., 292 F.2d 427 (9 Cir. 1961).

■ As we understand Cannelton and Monolith, they establish these significant principles: (1) that it was the intent of Congress to grant miners a depletion allowance based on constructive income from the raw material produced and not on the sales of the finished product; (2) the statutory percentage depletion allowance on the gross income of an integrated mining operator should be cut off at the point where the mineral first became suitable for industrial use or consumption; (3) Congress intended integrated mining-manufacturing operations to be treated as if the operator were selling the mineral to himself.

■ Applying the foregoing principles to our case, we conclude that the "commercially marketable mineral product" first obtained by Taxpayer was the raw shale immediately before the kiln processing. At that point the shale was suitable for industrial use or consumption. The fact that Taxpayer did not sell the shale in its raw state to others does not require a holding that there was no market within the meaning of the depletion statute. Since the shale was fit for industrial use in its raw state, Taxpayer as an integrated miner-manufacturer was its own market. Thus, Taxpayer's contention that the finished light aggregate is the first and only commercially marketable product obtained from its mining property must be rejected.

■ Taxpayer's second contention, supra, relating to the ordinary treatment processes is in our view interwoven in the first issue, nevertheless we believe independent and further consideration of the second issue is desirable. Taxpayer's position is that the heating does not change the chemical composition of the raw aggregate and that the aggregate at the end of the kiln process still constitutes a crude mineral product. Contrarily, the Government asserts that the kiln process was here used as a manufacturing process and that under the teaching of the Supreme Court in Cannelton, all manufacturing processes are excluded from mining. Regardless of whether the kiln process employed by Taxpayer is equivalent to manufacturing in the ordinary meaning of that term, we have no difficulty in concluding that the holding in Cannelton settles the issue adversely to appellee's contention. In Cannelton, the Court discussed at some length the definition of "ordinary treatment processes" and stated at 364 U.S. at pp. 85, 86, 87, 88, 80 S.Ct. pp. 1586, 1587:

> "Furthermore, none of the permissible processes destroy the physical or chemical identity of the minerals or permit them to be transformed into new products.

> \* \* \* \* \* \*

> "We now reach what 'ordinary treatment processes' are available to respondent under the statute. As the principal industry witness put it at hearings before the Congress: 'Obviously it was not the intent of

4. Virginia Greenstone Company is the only producer of greenstone in the United States and none of its quarry block was sold to others. The Court nevertheless held that its depletion allowance was to be computed on basis of income from sale of quarry block, and not from sale of the finished product, concluding that "The result is that the taxpayer must be regarded as having sold the quarry blocks to itself and is required to compute allowable percentage depletion on the gross income constructively received upon such sales." 308 F.2d at p. 673.

Congress that those processes which would take your products and make them into different products having very different uses should be considered, as the basis of depletion.' But respondent says that the processes it uses are the ordinary ones applied in the industry. As to the miner-manufacturer, that is true. But they are not the 'ordinary' normal ones applied by the nonintegrated miner. It was he whom the Congress made the object of the allowance. The fabrication processes used by respondent in manufacturing sewer pipe would not be employed by the run-of-the-mill miner —only an integrated miner-manufacturer would have occasion to use them."

As observed earlier, the taxpayer in Cannelton mined fire clay and shale. There, as here, the mineral was subjected to a heating process prior to the process which produced the finished product, clay pipe, etc. Nevertheless, the Court held " * * * when extracted from the mine, the fire clay and shale are in such a state that they are ready for industrial use or consumption—in short, they have passed the 'mining' state on which the depletion principle operates." Id. at 86, 80 S.Ct. at 1587.

Taxpayer finds support for its second contention in our case of Bookwalter v. Centropolis Crusher Company, 8 Cir., 305 F.2d 27 (1962), where we sustained the trial court's finding that the crushing and grinding of chemical grade limestone was the "ordinary treatment processes" normally applied by limestone producers. We believe Centropolis has distinguishing features. There, the process con-

sisted of crushing limestone into eight different sizes, and the Commissioner, inconsistently in our view, maintained that the cutoff point was after the seventh crushing operation. We believed then that the trial court's findings and conclusions were permissible and within the teachings of the Supreme Court in Cannelton.[5] We are now constrained to recognize that the force of our holding in Centropolis has been under-cut and weakened by the reversal of Riddell v. Monolith Portland Cement Company, 301 F.2d 488 (see 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492), upon which we relied in part in affirming Centropolis.

In summary, we are satisfied that here the District Court applied an erroneous legal concept in arriving at its conclusion. Accordingly, the judgment must be and hereby is reversed.

---

5. Although it did not agree with our opinion in Centropolis, the Government did not apply for certiorari. In its petition for writ of certiorari in Riddell v. Monolith Portland Cement Company, 301 F.2d 488, the Government stated in a footnote:

"In Bookwalter v. Centropolis Crusher Co., supra, the Eighth Circuit held that the 'mining' of limestone of chemical and metallurgical grade includes all of the

processes which the particular taxpayer employed to process its limestone into eight different graded sizes, including finely ground, although the taxpayer itself sold 80 percent of its limestone in crushed form without fine grinding. While we regard this decision as incorrect, we have not petitioned for certiorari because the record does not present the relevant issues with sufficient clarity."