**SOLITE CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 4095.

United States District Court
E. D. Virginia,
Norfolk Division.

May 16, 1966.

---◇---

Kaufman, Oberndorfer, Spainhour & Hall, T. Howard Spainhour, Norfolk, Va., for plaintiff.

C. V. Spratley, Jr., U. S. Atty., Norfolk, Va., for defendant.

WALTER E. HOFFMAN, Chief Judge.

On December 23, 1957, this Court rendered judgment in favor of Southern Lightweight Aggregates Corporation v. United States of America, Civil Action No. 2266, 58–1 U.S.T.C. para. 9235, 1 A.F.T.R. (2d) 392, in an action for the recovery of federal income taxes for the plaintiff's taxable years ending March 31, 1951, 1952 and 1953. The United States did not perfect any appeal from this decision. Shortly thereafter the name of the plaintiff was changed from Southern Lightweight Aggregates Corporation to Solite Corporation, but in all

148

other respects the plaintiff's process of "mining" and "ordinary treatment process" remains the same. The material facts and issues involved in the present litigation are essentially the same although the evidence herein presented is more extensive.

The instant proceeding is for the recovery of federal income taxes and interest thereon, in the aggregate sum of $31,-979.70, for the fiscal year ended March 31, 1958. Presumably the decision will affect years subsequent to 1958.

Since the 1957 decision there have been several cases decided by the United States Supreme Court,[1] the Court of Appeals for the Fourth Circuit,[2] and more recently, the Court of Appeals for the Eighth Circuit,[3] which command a more searching examination of the facts and law. Prior to *Cannelton* (1960), it was universally held that taxpayers were entitled to treat as "ordinary treatment processes", for the purpose of determining their gross income from "mining" and, *a fortiori*, their percentage depletion deductions, all of the treatment processes normally applied by the taxpayers in order to obtain the first mineral product which could be "commercially marketable". The latter term, "commercially marketable", had been uniformly interpreted to mean an actual sufficient market existing therefor.[4] Indeed, two cases required "marketability at a profit".[5] Thus there was ample authority to support the 1957 decision of this Court in the action between the same parties but, of course, the prior conclusion cannot operate as an estoppel against the

Government in the present case. As the Fourth Circuit pointed out in *Virginia Greenstone,* there is no need to be concerned with pre-*Cannelton* cases which may seem to point the other way.

Most of the essential facts have been the subject of a stipulation and, eliminating the formalities required as to filing a claim for refund, etc., we observe that the plaintiff-taxpayer, a Virginia corporation operating on a fiscal year basis ending March 31, is engaged in the business of extracting from the ground in Buckingham County, Virginia, a weathered material, commonly referred to as "weathered slate". The following steps are processes applied:

*Step 1*—The overburden, consisting of topsoil, on the surface of the ground is first removed.

*Step 2*—The weathered material lying below the top soil is then drilled and blasted and loaded on trucks, which carry said material to plaintiff's plant located approximately one-half mile from the quarry.

*Step 3*—The material is dumped from the trucks into the primary crusher and screener, where it is crushed and screened and then conveyed by a conveyor belt to a stock pile, from which it is conveyed by a conveyor belt and bucket elevator to a rotary kiln.

*Step 4*—The material is fed into the high end of the rotary kiln (which is on an inclined axis) and, as the kiln turns, the material passes slowly from the higher end to the lower end of the kiln, from which heat is blown into the kiln.

1. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960); Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963).

2. Virginia Greenstone Company v. United States, 308 F.2d 669 (4 Cir., 1962).

3. United States v. Light Aggregates, Inc., 343 F.2d 429 (8 Cir., 1965).

4. United Sates v. Cherokee Brick and Tile Co., 218 F.2d 424 (5 Cir., 1955); Hitchcock Corp. v. Townsend, 232 F.2d 444 (4 Cir., 1956); United States v. Sapulpa Brick and Tile Corp., 239 F.2d 694 (10 Cir., 1956); United States v. Merry Brothers Brick and Tile Co., 242 F.2d 708 (5 Cir., 1957), cert. den. 355 U.S. 824, 78 S.Ct. 31, 2 L.Ed.2d 38; Dragon Cement Co. v. United States, 244 F.2d 513 (1 Cir., 1957), cert. den. 355 U.S. 833, 78 S.Ct. 50, 2 L.Ed.2d 45.

5. Commissioner v. Iowa Limestone Co., 269 F.2d 398 (8 Cir., 1959); Bookwalter v. Centropolis Crusher Co., 272 F.2d 391 (8 Cir., 1959).

*Step 5*—The material drops from the lower end of the kiln to the ground, where it stays long enough to become cool.

*Step 6*—The material is then placed, through the use of a clam shell bucket and crane, in the secondary crusher and screener, where it is crushed and screened and then loaded by a conveyor belt into freight cars.

It is conceded that no other substance or material of any kind is added during the above described treatment process. The rotary kiln is a "sintering process" which causes an agglomeration of the raw material by incipient fusion. The heat, approaching 2400°, causes the material to expand or bloat. In its final form taxpayer's product, sold under the tradename of "Solite", is used as a lightweight aggregate in making building units such as blocks.

■ Taxpayer contends that the finished lightweight aggregate as it emerges from the secondary crusher or, if not, then from the rotary kiln, is the first and only "commercially marketable mineral product" taken from its mining property, and that the rotary kiln process is an "ordinary treatment process" normally applied by mine owners to obtain the commercially marketable product. The Government urges that the cut-off point to "mining" is through the primary crusher stage of processing, i. e., at the end of Step 3. Because of the recent decisions, especially the Eighth Circuit opinion in *Light Aggregates,* the Court agrees with the Government.

The pertinent statute involved is § 613 of the Internal Revenue Code of 1954 dealing with "Percentage Depletion". In substance it provides that in case of "mines and other natural deposits" the allowance for depreciation shall be the percentage of the gross income from the property.[6] The term "gross income from the property" is defined to mean "the gross income from mining". § 613(c) (1). "Mining" is defined under § 613 (c) (2) as follows:

"The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills."

Under § 613(c) (4) the term "ordinary treatment processes" is said to include—

"(C) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product —sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment;

"(D) in the case of lead, zinc * * *; [and]

"(E) the pulverization of talc, the burning of magnesite, and the sintering and nodulizing of phosphate rock."

From the foregoing it appears that the pertinent inquiries are (1) was the process adopted by the taxpayer in subjecting the material to the heat of the rotary kiln an "ordinary treatment process", (2) if so, was it applied to obtain the "commercially marketable mineral product", and (3) does the "sintering" process so applied constitute a requisite mining process involving a mineral "customarily sold in the form of a crude mineral product" or for the purpose of bringing the

---

6. The percentage, as applied to the facts of this case and subject to the views expressed herein, is agreed to be 5% as the material when used by the mine owner was for use of "concrete aggregates, or for similar purposes." § 613(b) (6).

material "to shipping grade and form, and loading for shipment".

We must discount taxpayer's contention that the "sintering process" affords any comfort to the position advanced by plaintiff. Clearly the evidence shows that the lightweight aggregate is no longer customarily sold as a "crude mineral product" after it emerges from the rotary kiln; nor is the "sintering" for the purpose of bringing the material "to shipping grade and form, and loading for shipment". While an analysis of the components of the raw material taken from the Bremo Bluff quarry and the clinker emanating from the kiln are substantially identical, the Xray diffraction demonstrates a marked or radical chemical change or, as sometimes described, a compound change.[7]

The record adequately supports the taxpayer's argument that there were no actual sales of the unprocessed material by the plaintiff-taxpayer to others. In that sense there was certainly no "available market" as the layman would interpret the words, until the product emerges from the kiln. There is some intimation that the unprocessed material might be used "if you did not have anything better", or it could conceivably be used on "unimportant roads" but could not be sold in any quantity. There is a suggestion that it might be used as a roofing granule in conjunction with other products, although this contention is seriously disputed. Manifestly, it is too soft and without sufficient strength to meet any minimum specification in road work. In short, unless used for processing in the final production of lightweight aggregate, it is universally discarded. It serves no utility in industry prior to its introduction into the rotary kiln.

The difficulty with this argument is that the Supreme Court has unequivocally held and established that actual sales are not a prerequisite to commercial marketability. In *Cannelton*, the Court said:

"Ever since the first percentage depletion statute, the cut-off point where 'gross income from mining' stopped has been the same, i. e., where the ordinary miner shipped the product of his mine, * * * [a]s we see it, the miner-manufacturer is but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned."

Later, in United States v. Longhorn Portland Cement Company, 328 F.2d 491 (5 Cir., 1964), the Fifth Circuit, after discussing the effect of *Cannelton* and *Riddell*, pointed out that the allowance for depletion was limited to "the constructive income received from such crushed limestone"; and that Congress intended to grant miners a depletion allowance on constructiive income from the raw material produced, if marketable in that form, and not on the value of the finished product.

■ It is, of course, argued that the cut-off point should be where the mineral became commercially marketable but, under the teachings of *Cannelton, Longhorn Portland Cement,* and *Light Aggregates,* we find that the true test of the cut-off is *where the mineral first became suitable for industrial use or consumption,* and this is to be treated as though the miner sold the material to himself for processing.

We need not enter into an extended discussion of taxpayer's status as an integrated mining operator. In the testimony of A. G. Ford, Director of Sales, Southern Lightweight Aggregate Corporation (plaintiff's predecessor name), before the Senate Committee on Finance in 1951, repeated references are made to the "manufacture" of lightweight aggregate. We think that the taxpayer's status reaches the point of being an integrated

---

7. A standard handbook entitled "Industrial Minerals and Rocks" classifies lightweight aggregate as a "crude mineral product", but the passage from this handbook likewise indicates that it is a "manufactured" lightweight aggregate. For this reason the reference material is of little assistance in solving the issues presented.

miner-manufacturer when the material reaches the rotary kiln.

The case of United States v. Light Aggregates, Inc., supra, is on all fours with the factual situation here presented. It involves the same finished product although the components of the raw material may be somewhat different. The material has the same expanding or bloating propensity when subjected to high temperatures. When the material emerges from the rotary kiln, it resembles a "clinker" such as in the case under consideration. We find this Eighth Circuit opinion to be controlling in all respects and accordingly must dismiss the complaint herein.

A judgment order will be entered upon presentation and endorsement by counsel. No attempt has been made to compute the correctness of the tax collected and is only intended to determine the factual and legal issues governing the assessment of said tax.