JONES & LAUGHLIN STEEL
CORPORATION, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 75–1571.

United States District Court,
W. D. Pennsylvania.

Aug. 5, 1977.

Carl E. Glock, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff.

Thomas M. Lawler, Jr., Dept. of Justice, Washington, D. C., Thomas A. Daley, Asst. U. S. Atty., Pittsburgh, Pa., for defendant.

## OPINION

SNYDER, District Judge.

This action is a civil refund suit for the recovery of corporate income taxes for the taxable year 1960 in the amount of $111,-504.12, attributable to an adjustment made by the District Director of Internal Revenue by which the Plaintiff's iron ore depletion deduction was reduced in the amount of $214,431.00. The case was fully stipulated to the Court and expertly briefed by counsel. We are asked by the Government to find in its behalf because the question is controlled by the decision of the Supreme Court of the United States in *United States v. Cannelton Sewer Pipe Company*, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960). We find that the Government's position is not well taken and judgment must be entered for the Plaintiff.

The Plaintiff filed its federal corporate income tax return for the year 1960 with the District Director at Pittsburgh, Pennsylvania, and paid the taxes shown to be due thereon. Upon audit of the Plaintiff's return, the District Director made the adjustment which resulted in tax deficiencies asserted in the principal amount of $2,041,-456.04, which the Plaintiff paid. On March 19, 1968, the Plaintiff filed with the District Director a claim for tax refund in the principal amount of $114,504.12.[1]

---

1. J&L also claims the assessed interest paid and statutory interest on the principal with the excess of $3,012.36 claimed being attributable to disallowed iron ore depletion of $5,793.00

The District Director allowed a percentage depletion of iron ore processed at the mines but disallowed the depletion for that same process carried out at steel mills located at distances from the mines.

Plaintiff is a major manufacturer of steel, mining its own iron ore for use in its steel mills. As a miner, Jones & Laughlin Steel Corporation (J&L) is entitled to a depletion deduction designed as an allowance for the exhaustion of the mineral assets used up in the mining process and not as a subsidy to miners who are also manufacturers of products. It compensates for the exhaustion of a wasting asset and encourages exploration and discovery of mineral deposits. *See Parsons v. Smith,* 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959).

As stated in the Government's Brief (p. 12):

"There is no dispute in this case, . . that the Plaintiff is entitled to a depletion deduction with respect to its iron ore mining activities."

The dispute between the parties here is as to the depletion base, that is, the gross income from mining against which the percentage depletion is to be applied.[2] We must therefore determine the proper amount of "gross income from mining" by deciding whether or not that "gross income from mining" should include the value added to the iron ore by the process carried on at the mills, known as "sintering". If, on the one hand, the sintering of the Plaintiff's iron ore at its mills is a non-mining process, that is a manufacturing process, then the value added to the iron ore by such processing should not be included in determination of "gross income from mining" for percentage depletion purposes.

not being raised or contested by the Plaintiff in this action.

2. The amount of a depletion deduction may be computed under either of two methods: the cost method (Section 612 of the Code) or the percentage method (Section 613 of the Code). When used hereafter, the Code means the Internal Revenue Code of 1954, unless otherwise noted. Plaintiff chose the percentage method

## I.

Under Section 613 of the Code, the depletion deduction is allowed as a percentage of the "gross income from property" which is defined in the same Section as "gross income from mining."[3] And "mining" is defined in Section 613(c)(2) as including not just the extraction of the mineral from the ground but also

"the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation or ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills."

Section 613(c)(4) of the Code designates the minerals and processes which are included in the "ordinary treatment processes". The ore involved in this case, iron ore, is specifically designated and the process of "sintering" is named as an ordinary treatment process in Section 613(c)(4)(C).

As a possible aid in interpretation, we turn to the Treasury Department's submission to the Committee on Ways and Means in February of 1959, a proposed draft of legislation to amend, among other things, the provisions of Section 613(c)(4) of the Code (106 Cong.Rec. Part 10, p. 13216 (1960)). In addition to "sorting" and "concentrating" as treatment processes, the Treasury proposal would have allowed additional processes only if necessary "to bring

and there is no dispute that 15% is the correct percentage applicable to iron ore mined by J&L.

3. In its present form, Section 613 applies to the taxable year beginning after December 31, 1960. Since this case involves the taxable year beginning January 1, 1960, we must apply Section 613 as it appeared in 1960.

the mineral or ore to form and condition suitable for shipment." Such additional processes were defined as "those processes which are necessary to bring the mineral or ore to the fiscal form and condition in which it is capable of being transported as distinguished from those processes applied to make the mineral or ore salable." The Treasury's proposed amendment was introduced by Senator Gore on the floor of the Senate as an amendment to H.R. 12381, which was subsequently enacted but not in the form in which it was introduced. Rather the Senate-House Conferees receded from the amendment as proposed and adopted by the Senate, and, instead, adopted an amendment substantially restating existing law and effective beginning after December 31, 1960, as follows:

"in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and [ores or] minerals which are customarily sold in the form of crude mineral product—sorting, concentrating, sintering, [and substantially equivalent processes] to bring to shipping grade and form, and loading for shipment; . . .." [Words in brackets added in 1960].

Thus, after the 1960 Amendment, Section 613(c)(4)(C) of the Code reads substantially the same as it did for the tax year involved (1960).

We now turn to *United States v. Cannelton Sewer Pipe Co.,* 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960), where the Court held 364 U.S. at 85, 80 S.Ct. at 1586, 4 L.Ed.2d at 1587:

" . . . [T]he Section contains four categories of 'ordinary treatment processes': the first enumerating those permissible as to the mining of coal; the second, as to sulphur; the third, as to minerals customarily sold in the form of the crude mineral product; and the fourth, as to those ores nor customarily so sold. We note that Congress even states the steps in each permissible process, and in addition specifically declares some processes not to be 'ordinary treatment' ones, viz., 'electrolitic deposition, roasting, thermal or electric smelting, or refining.'

Furthermore, none of the permissible processes destroy the physical or chemical identity of the minerals or permit them to be transformed into new products.

From this legislative history, we conclude that Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral. product, if marketable in that form, and not on the value of the finished articles."

In *Cannelton,* the Court found three-fifths of the fire clay produced in Indiana was sold in its raw state. In addition, large sales of fire clay and shale were made across the river in Kentucky indicating that fire clay and shale were commercially marketable in their raw state. By way of contrast, of the iron ore consumed in the United States in 1960, approximately 99% was used in furnaces to produce iron and steel.

The Court further states in *Cannelton, supra,* 364 U.S. at 1587, 80 S.Ct. at 87, 4 L.Ed.2d at 1588–90:

"Ever since the first percentage depletion statute, the cutoff point where 'gross income from mining' stopped has been the same, i. e., where the ordinary miner shipped the product of his mine. Respondent's formula [that the first commercially marketable mineral product is sewer pipe and other vitrified articles was the first commercially marketable mineral product at which fire clay and shale could profitably be sold] would not only give it a preference over the ordinary nonintegrated miner, but also would grant it a decided competitive advantage over its nonintegrated manufacturer competitor. Congress never intended that depletion create such a discriminatory situation. As we see it, the miner-manufacturer is but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned.

\*   \*   \*   \*   \*   \*

Depletion, as we read the legislative history, was designed not to recompense for costs of recovery but for exhaustion of mineral assets alone. If it were extended

as respondent asks, the miner-manufacturer would enjoy, in addition, to a depletion allowance on his minerals, a similar allowance on his manufacturing costs, including depreciation on his manufacturing plant, machinery and facilities.

\*     \*     \*     \*     \*     \*

In view of the finding that substantial quantities—in fact, the majority—of the tonnage production of fire clay and shale were sold in their raw state, we believe that respondent's mining activity during the year in question would come under clause (iii) of the section here involved. That clause includes 'minerals which are customarily sold in the form of crude mineral product.' We believe that Congress intended integrated mining-manufacturing operations to be treated as if the operator were selling the mineral mined to himself for fabrication. It would, of course, be permissible for such an operator to calculate his 'gross income from mining' at the point where 'ordinary' miners—not integrated—disposed of their product. All processes used by the nonintegrated miner before shipping the raw fire clay and shale would under such a formula be available to the integrated miner-manufacturer to the same extent but no more."

There followed in 1963, *Riddell v. Monolith Portland Cement Co.,* 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963), where the taxpayer mined limestone from its own quarry, crushed it, transported the crushed product two miles to its plant, and there, through the addition of other materials and further processing, manufactured the limestone into cement, which it sold. The taxpayer elected to pursue its claim for depletion on the finished cement product rather than accept a cutoff point for depletion— the "prekiln feed stage of manufacture". The evidence in *Riddell* was that crushed limestone was not only marketable in that form but was sold in California in 1952 in an amount exceeding 1,500,000 tons and sales in the United States for that year exceeded 216,000,000 tons. Both of these figures excluded the tonnage used in the manufacture of cement while the stipulation showed that limestone sold and used for our purposes totaled almost 300,000,000 tons in 1952. The Supreme Court then found no difficulty in *Riddell* in holding 371 U.S. at 539, 83 S.Ct. at 379, 9 L.Ed.2d at 493:

"We found [in *Cannelton*] that 'the cutoff point where "gross income from mining" stopped has been the same' ever since the first depletion statute, namely, 'where the ordinary miner shipped the product of his mine.' Id. 364 U.S. at 87 [80 S.Ct. [1581] at 1587] It therefore appears from this record that the 'product' with which the Code deals here is the taxpayer's product at the point when 'mining' terminated, i. e., when it reached the crushed limestone stage. This results in limiting the taxpayer's basis for depletion to its constructive income from crushed limestone, rather than from the finished cement." [Footnote omitted.]

The *Cannelton* principle has been uniformly applied. *See for example, United States v. Longhorn Portland Cement Co.,* 328 F.2d 491 (5th Cir. 1964); *Solite Corp. v. United States,* 375 F.2d 684 (4th Cir. 1967), cert. den. 389 U.S. 841, 88 S.Ct. 70, 19 L.Ed.2d 104 (1968); *Virginia Greenstone Co. v. United States,* 308 F.2d 669 (4th Cir. 1962); *United States v. Light Aggregates, Inc.,* 343 F.2d 429 (8th Cir. 1965); *Morton Salt Co. v. United States,* 316 F.2d 931, 161 Ct.Cl. 640 (1963), cert. den., 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1964); *Iowa Limestone Co. v. United States,* 365 F.2d 63 (8th Cir. 1966); *Commissioner v. Halquist,* 291 F.2d 49 (7th Cir. 1961), cert. den. 368 U.S. 930, 82 S.Ct. 367, 7 L.Ed.2d 193 (1962); *Standard Realization Co. v. United States,* 289 F.2d 247 (7th Cir. 1961); *United States v. Portland Cement Co. of Utah,* 338 F.2d 798 (10th Cir. 1964); *Riddell v. California Portland Cement Co.,* 297 F.2d 345, 353 (9th Cir. 1962); *Winnsboro Granite Corp. v. Commissioner,* 283 F.2d 307, 309 (4th Cir. 1960); *see also, Riddell v. Victorville Lime Rock Co.,* 292 F.2d 427, 436 (9th Cir. 1961); *United States v. Portland Cement Co. of Utah,* 293 F.2d 826 (10th Cir. 1961).

The Plaintiff in the case *sub judice* points to *Cannelton* as determining only that the depletion was claimed on the end product (i. e., the vitrified sewer pipe) and the Supreme Court found the depletable mineral product was raw clay and shale and argues the fact that *Cannelton* did not involve the question of any of the named ores or minerals which require "ordinary treatment processes" that are applied to separate, or extract, or agglomerate [4] the mineral.

They point out as examples, *United States v. Longhorn Portland Cement Co., supra* (calcinating of cement rock to produce cement); *United States v. Light Aggregates, Inc., supra,* and *Solite Corp. v. United States, supra* (expansion by kiln treatment of shale or weathered material to produce concrete aggregates and building blocks). In each of these cases, the taxpayers were forced to argue that an intervening process involving kiln heating or burning constituted a mining process in order to avoid being cut off at the earlier raw mineral stage. Further, they argue that kiln heating in these cases did not involve the process of sintering specifically provided for under Section 613(c)(4)(C) of the Code, which in the statutory sense, is agglomeration performed not to affect a fundamental change in the constituent mineral, while kiln heating was to affect a fundamental chemical change and necessarily therefore involved a manufacturing process.

The Plaintiff, correctly we believe, points to the fact that in the early days it was the practice to mine ore suitable for use in iron and steel furnaces without any beneficiation,[5] these were known as "direct shipping ores". As the supply of these direct shipping ores was depleted, lower grade and quality of iron ores which required beneficiation were used. The increasing demands for iron ore, heightened by two World Wars, and the rapid depletion of the country's reserves of ore capable of being brought up to "direct shipping" quality by simple concentrating techniques led to the application of further improved methods of beneficiating including grinding, washing and other separation processes in order to separate and recover the iron ore from the surrounding rock and waste material. Because of this improved processing, iron concentrates became increasingly fine in structure. To feed these fine concentrates directly into blast furnaces was found to reduce the furnace's efficiency and there was a loss of fines blowing out of the top of the stack. Consequently the fine concentrates were agglomerated to provide a more suitable form for charging the blast furnace.

During the taxable year 1960, Plaintiff was engaged in the business of manufacturing iron and steel at its mills located at Pittsburgh and Aliquippa, Pennsylvania, and Cleveland, Ohio. It operated iron ore mines, coal mines and limestone quarries which furnished a major portion of the raw materials required in the making of iron and steel at its plants. Plaintiff operated an open pit and mine, known as Benson Mine (at Starlake, New York) and three open pit mines on the Mesabi Range in Minnesota (the Minnesota Mines). The

---

4. Agglomeration is the process of bringing together smaller iron ore products into larger ones. The principal variations of iron ore agglomeration are "sintering" and "pelletizing". Sintering involves heating on a traveling grate to a temperature at which incipient, but not complete, fusion occurs. A bed of small iron ore particles is bonded into a clinker-like aggregate at temperatures sufficient to produce incipient fusion. The rate of burning is controlled by drawing or pulling air into the bed. Pelletizing was developed to agglomerate taconite concentrates which were too fine for sintering efficiently. The taconite ore is crushed and ground very fine and the concentrate is agglomerated by balling the humid iron concentrate on a suitable drum or disc to produce

"green pellets" about $3/8$ to $1/2$ inch in diameter to which is added a binder. Then the green pellets are burned by being indurated with heat at temperatures high enough to thoroughly dehydrate them and to induce incipient fusion without fusing the pellets together. Taconite in its natural state is not useful in the blast furnace and there must be involved a separation of the minute iron materials from the large amount of waste which results in very fine concentrate.

5. Beneficiation is a concentration or preparation for smelting by drying, sintering, or magnetic concentration—Webster's Third International Dictionary.

crude ores from the Minnesota Mines are not suitable for blast furnace feed material without beneficiation, and therefore by crushing, screening and gravity processes there was produced a fine concentrate known as the "classifier" and a coarser concentrate. These concentrates were loaded separately and transported by rail to port, where such concentrates were then transported by lake vessels to Plaintiff's steel mills in Cleveland and further separately transported by rail to Plaintiff's Pittsburgh and Aliquippa mills.

The Benson Mine is an open pit operation in St. Lawrence County, New York, and the ore is beneficiated by crushing and grinding which results in a very fine concentrate. Plaintiff conducts sintering operations at the Benson Mine, as well as at the steel mills in Cleveland, Pittsburgh and Aliquippa. The major portion of the Benson Mine concentrates are sintered at the Benson Mine but a portion of them are shipped each year to the Plaintiff's steel mills for sintering. The Benson Mine concentrates which were sintered at Benson were also shipped by rail to the Plaintiff's steel mills where the sintered materials were charged directly into the blast furnaces for smelting.

At the sintering plants located at the steel mills, the fine concentrates (i. e., (1) the Minnesota Mines classifier, and (2) the Benson Mines concentrates which were not sintered at Benson but shipped to the steel plants for sintering) were agglomerated before being fed into the blast furnaces. (The Benson concentrates sintered at the Benson Mine plant, as noted, were charged directly into the blast furnaces.)

In determining its depletion base, the District Director allowed the depletion claimed on the Benson Mine concentrates, including a cost attributable to the sintering applied at the Benson Mine, but inconsistently disallowed the depletion claim attributable to the sintering of the Benson Mine concentrates at the Plaintiff's sintering plants located at its steel mills.[6]

As might be expected, Plaintiff points to the fact that the ores mined by the Plaintiff at the Benson and Minnesota Mines were not suitable to be used in their blast furnaces for smelting into iron and call attention to the fact that in the United States in 1960 approximately 99% of the iron ore consumed was used in furnaces to produce iron and steel.

II.

Plaintiff points out that Section 613(c)(4)(C) specifies that "sintering" is an expressly named mining treatment process in the case of iron ores.

Treasury Reg. 77 (Article 221(g) (1933)) which first granted percentage depletion to the mining industry, contained the following provision with respect to allowable mining processes for ores customarily sold in the form of crude mineral product:

"(3) In the case of iron ore and ores which are customarily sold in the form of the crude mineral product—sorting or concentrating to bring to shipping grade and loading at the mine for shipment. . . ."

The regulatory provision above was the forerunner of Code Section 613(c)(4)(C), applicable to the year 1960, and was promulgated under the Revenue Act of 1932 which limited the processes to "sorting and concentrating to bring to shipping grade." (Grade having reference to the chemical analysis of the iron ore, including its iron content.)

---

6. Plainly stated, the Internal Revenue Service made a mistake in allowing the plaintiff a depletion deduction in an amount attributable to the value of the iron ore sintered at the Benson Mine. The concentrates sintered at the Benson Mine were identical to those Benson concentrates which the plaintiff sintered at its steel mills. Since, as we have explained earlier, the Benson Mine concentrates which were shipped to the Plaintiff's steel mills were commercially marketable before sintering, so, too, the concentrates which were sintered at the Benson Mine site were commercially marketable prior to the application of the sintering process. The Internal Revenue Service, therefore, should not have allowed the Plaintiff to compute its percentage depletion on the increase in value attributable to the Benson Mine concentrates sintered at the mine. [Defendant's Brief, p. 43.]

When the 1932 regulations were codified into the Revenue Act of 1943, the word "sintering" was added, together with the words "and form" inserted after the word "grade". Obviously, the word "form" in its ordinary connotation included physical characteristics such as size, shape and hardness necessary to correctly describe the process. The real question here boils down to whether or not this term was expanded to mean "an iron ore suitable for blast furnace use" as to form and not merely as to grade. Thus, we believe the contention of the Plaintiff is well taken that the words "to bring to shipping grade and form" refer to the application of the specified processes applied to make the iron ore comparable to "direct shipping ores" both as to grade and form, i. e., in the case of iron ore, an ore suitable for blast furnace use.

## III.

We further believe that the above interpretation is that required by the Revenue Act of 1943, for sintering operations were carried on at steel mills and also at the iron ore mines by both integrated and non-integrated miners. If the drafters of that 1943 Amendment intended to exclude sintering following shipment from the mines, or to exclude sintering of ore physically capable of being transported, they could very easily have so provided.

Regulation 77, noted above and issued under the Revenue Act of 1932, could have been construed as limiting mining treatment processes for coal, sulphur and ores which were customarily sold in form of the crude mineral product to those processes applied at the mine. However, in 1943, when mining treatment processes were first included in the Internal Revenue Code, the words "at the mine" were eliminated from all three categories. This development, together with the fact that in 1950, the Code was amended to allow mining transportation for distances of fifty miles clearly indicates that none of the treatment processes must be applied at the mine in order to be allowable. And we note again at this point, the Treasury Department's proposal to al-

low additional processes only if necessary to bring the mineral ore "to form and condition suitable for shipment", i. e., in which it was capable of being transported as distinguished from "those processes applied to make the mineral or ore saleable", was not accepted and, instead, the Senate-House Conferees substantially restated existing law.

We note in particular what was said by the Tax Court in *Barton Mines Corporation v. Commissioner,* 53 T.C. 241, 258, *reversed and remanded on other issues,* 446 F.2d 981 (2nd Cir. 1971):

"Relying upon language in the Supreme Court's decision in *United States v. Cannelton Sewer Pipe Co., supra,* 364 U.S. at 87, 80 S.Ct. 1581, and *Riddell v. Monolith Cement Co.,* 371 U.S. 537, 539, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963), respondent contends that once a process is found to be nonmining it is a 'cutoff point,' and that subsequent processes must, therefore, likewise be considered as nonmining. It is true that in those cases the Court spoke of a point at which 'mining' terminated and 'nonmining' or 'manufacturing' began. But it was never intended that a process specifically enumerated in the statute as a mining process should be considered as nonmining merely because it happened to follow rather than precede a nonmining process."

The Government argues that once a mineral product is commercially marketable, a taxpayer is not entitled to the benefit of any additional treatment process even though it is permitted by statute. It points to the fact that not all treatment processes are allowable as mining processes but, rather, that the only allowable mining processes are those normally applied by miners as miners. We think the evidence in this case makes the argument of the Government turn upon itself for it is clearly apparent, as distinguished from *Cannelton,* that there is here an ordinary treatment process normally applied by mine owners to obtain a commercially marketable mineral product. *Cf.*

*Dravo Corporation v. United States,* 348 F.2d 542, 172 Ct.Cl. 200, (1965)[7].

 We therefore find that with respect to the iron ore fines and concentrates mined by the Plaintiff at its Benson and Minnesota Mines, the sintering of these fines and concentrates at facilities located away from the mine, and at or near the Plaintiff's blast furnaces, are a mining process so that the increase in value of the sintered fines and concentrates should be added to the Plaintiff's gross income from mining, as defined in Section 613(c) of the Internal Revenue Code of 1954, for the purpose of computing Plaintiff's percentage depletion deduction. The parties will accordingly be required to submit a joint form of judgment within 30 days to compute the correct amount of the refund due to the Plaintiff on the basis of allowing the iron ore depletion deduction as claimed and disallowed.

An appropriate Order will be entered.

Brown & Altshuler, Beverly Hills, Cal., for plaintiffs.

---

**7.** In that case, sand and gravel from islands in the Ohio River were taken by dredges on which the sand and gravel were crushed, washed and sized. Some was sold directly to customers from the dredges and some was transported to stock piles and then sold. The court was concerned with what was the "ordinary treatment process", the same question with which we must here be concerned.