**IOWA LIMESTONE COMPANY,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. No. 3-806.**

United States District Court
S. D. Iowa,
Central Division.
Oct. 13, 1964.

James Evans Cooney, Des Moines, Iowa, for plaintiff.

Thomas F. Field, Department of Justice, Washington, D. C., for defendant.

HANSON, District Judge.

Iowa Limestone Company is an Iowa corporation with its principal office at 500 New York Avenue, Des Moines, Iowa. Its quarry is located at Alden, Iowa, approximately eighty-five miles north of Des Moines. This is a suit for the refund of Federal income taxes for the years 1952 and 1953. Plaintiff claims a refund in the amount of $64,025.98, with interest at the rate of 6% per annum and the costs of the suit. Iowa Limestone Company filed timely claims for refund relating to income taxes for the years 1952 and 1953 in the amounts of $29,259.24 and $34,766.74. These claims for refund were disallowed on October 17, 1956. Iowa Limestone Company's claims for refund were based upon a depletion allowance for chemical grade limestone of 15% rather than 10% as previously contended by the Internal Revenue Service and upon the ground that the Internal Revenue Service erred in excluding all of the Iowa Limestone Company's processes after hammer mill operation in determining the depletion allowance.

Iowa Limestone Company is an Iowa corporation principally engaged in the mining and processing of chemical grade limestone and the sale of the product in Iowa and contiguous states.

The processes employed by taxpayer consist of stripping the overburden, and blasting the face of the quarry with explosives in drill holes. The broken limestone is loaded in trucks and hauled to the primary crusher which reduces it to varying sizes from a tennis ball to a football or basketball. The large pieces

**280**

are carried into the plant by belt conveyor where a secondary crushing in hammer mills takes place. The limestone is then conveyed into roller mills which process the material, and the moisture is removed by hot air being forced through the roller mills. The limestone is drawn by air stream from the top of the roller mills by a series of collectors. Part of the finely processed limestone is treated with chemicals, such as iodine, upon specifications of particular customers. Both the chemically treated and untreated finely ground limestone are packaged in 50 and 100 pound paper bags. The introduction of air, heated to about 400 degrees, merely removes the moisture and does not cause any chemical change.

During the years in question, Iowa Limestone Company produced limestone to be used as a feed additive. This must be 95% pure calcium carbonate. It must be finely ground, free from toxic impurities, and must not contain more than 1% moisture. However, Iowa Limestone Company also produced and sold coarse barnlime, regular barnlime, litterlite, and "D" grind.

In Bookwalter v. Centropolis Crusher Company, 305 F.2d 27 (8th Cir.), the court said:

"In ruling against taxpayer there, which urged that its first marketable product was the finished item, the court struck out all consideration of profit in making such determination. However, in its discussion of the raw mineral product, the court re-affirmed the principles to be applied under the statute, and at p. 87 of 364 U.S., at p. 1587 of 80 S.Ct. stated: 'Ever since the first percentage depletion statute, the cut-off point where "gross income from mining" stopped has been the same, i. e., where the ordinary miner shipped the product of his mine.' At p. 88, 80 S.Ct. at p. 1587, as to ordinary treatment processes, the court ruled that these are 'the "ordinary" normal ones applied by the nonintegrated miner.'"

The court was referring to United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581.

The court in Centropolis also states that "under the language of the 1939 Code, determination of what constitutes the 'commercially marketable product,' and 'ordinary treatment processes' in a given situation depends upon the facts at hand."

After the Centropolis case, the Government was not satisfied that ordinary treatment processes of miners of metallurgical grade limestone were actually as the court found them to be in Centropolis. However, the Government says that no attempt was made to take that case to the United States Supreme Court because the record did not in fact show that the ordinary treatment processes were contrary to the court's findings.

The present case is an attempt to improve the record over the record produced in Centropolis and to show that the ordinary treatment processes of metallurgical grade limestone miners consist of shipping the product after the primary crusher process and not of shipping after the roller mill process which reduces the limestone to a finely ground product.

The Government produced evidence in this case of the quantity of metallurgical grade limestone, its uses, and the forms in which it is used. The Government also produced evidence of the quantity of lower grade limestone, its uses, and the forms in which it is used. Use in feed is not one of the major uses of metallurgical limestone. The three major uses of this stone are calcined lime, metallurgical fluxing stone, and chemical grade stone for making glass. Finely ground stone is not used for any of these three purposes. Also, metallurgical stone is rare only in the sense that it is not as abundant as lower grade limestone. Metallurgical grade limestone is found in at least 21 different quarries in Iowa alone. It is available in a broad band from Gilmore City, Iowa, to Kentucky. Of course, there are also other bands of this high grade stone.

The plaintiff's processes would be ordinary treatment processes only if, as plaintiff contends, there is no national chemical grade limestone market and each producer's processes are the ordinary treatment processes. Since the stone is mined in large amounts by various miners and used in processes which require metallurgical stone, the only justification for saying there is no national market is that it would not be profitable for all miners to ship the stone prior to fine grinding. The stone is expensive to ship and, being widely available, is quarried close to where it is needed.

Use for feed not being one of the major uses of metallurgical limestone, the treatment or process in fine grinding the stone for that purpose is not an ordinary treatment process. Ordinarily, the stone is shipped in large sizes for the other major uses which the stone has. The finely ground limestone, of course, has some uses other than for feed but these are not major uses of metallurgical limestone.

The court in Centropolis pointed out three factors present in that case which were not present in Cannelton. Those are:

"a) the taxpayer was an integrated miner-manufacturer; b) taxpayer did not market any of the mineral in its raw state, although it was conclusively shown that 3/5 of the fire clay mined in Indiana was sold in its raw state; c) the depletion base claimed in Cannelton was the gross income from a manufactured product—vitrified clay tile."

First, the parties at oral argument conceded that the term "integrated miner-manufacturer" is only a term of art. Any process past the ordinary treatment process is a manufacturing process or at least it might as well be for it is not to be considered in giving the depletion allowance. In the present case, it is shown that Iowa Limestone processes are not typical of the processes used by the largest percent of miners of metallurgical limestone, the same as was true in Cannelton. The Iowa Limestone processes were not manufacturing processes in the sense that the chemical composition of the stone was changed and on that point is dissimilar to Cannelton. However, the rule cannot be that all process prior to changing the chemical composition is allowable for depletion purposes. Other courts have not so read the Cannelton case. See Morton Salt Co. v. United States, 316 F.2d 931 (Court of Claims). That type of distinction was not the basis for the Centropolis decision as this court reads that opinion.

In Riddell v. Monolith Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492, the court said: "that included within the term 'mining' were 'the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product.'" The processes of Iowa Limestone Company, while they are used by some miners, are not used by most, or at least not used by the miners who produce metallurgical limestone for its principal uses, and as such, the processes of Iowa Limestone Company are not those normally applied.

Also, the Supreme Court in Monolith said: "[T]he statutory percentage depletion allowance on the gross income of an integrated mining operator should be cut off at the point where the mineral first became suitable for industrial use or consumption." It is undisputed in this record that the mineral does not first become suitable for industrial use or consumption after the roller mill process but rather first becomes so suitable while it is still in large sizes.

It is not clear exactly what "integrated" means. This court does not believe that the court in Monolith intended a miner who refined the stone in the manner done by Iowa Limestone Company would have a depletion advantage over a miner who changes the composition of the stone or who mixes it with other materials.

■ Revenue Ruling 62–5 was issued to achieve administrative uniformity in connection with the percentage depletion of such minerals as metallurgical limestone. Two tests to ascertain processes allowable are prescribed. To be allowable as a mining process, a given size reduction operation must (1) commence with material which will remain on a number 20 screen and (2) end with material at least 5% of which will remain on a number 45 screen.

The plaintiff contends that since "Plaintiff's coarse barnlime, regular barnlime, litterlite, and 'D' grind were all products 5% of which (or more) remained on a number 45 screen," the plaintiff should be allowed to use the plant realization of $5.39 per ton for 1952 and $5.81 per ton for 1953 as the price per ton to be used in computing the depletion allowance.

The plaintiff's argument is that since the same roller mill which produces the finely ground product also produces the barnlime, litterlite and "D" grind, the plaintiff should be allowed to deplete the product at its market price after the roller mill. Ruling 62–5 excludes "fine pulverization" as a process but states that coincidental production of fines as a by-product of allowable size reduction processes is not included in the excluded "fine pulverization." In the present case, the fine ground product is not a by-product coincidental to the production of the barnlime, litterlite and "D" grind and the plaintiff's interpretation of Ruling 62–5 is clearly incorrect.

The Government admits that the hammer mill is an allowable mining process under Ruling 62–5. The Government contends that "the taxpayer's screen tests also indicate that the taxpayer's roller mill operation is not an allowable mining process because only 1.88 percent of the material emerging from the taxpayer's roller mills in 1952 would remain on a number 45 screen. The corresponding figure for 1953 is 2.53 percent. Hence, the cut-off point to mining for this taxpayer lies after the taxpayer's hammer mill but before the taxpayer's roller mill. Were it not for Revenue Ruling 62–5, the cut-off point would lie after the taxpayer's primary crusher and before the hammer mill."

■■ It is the Government's argument that after the product passes through the roller mill, 5 percent will not stay on the number 45 screen. Hence a constructive price must be placed on the stone prior to the time it enters the roller mill but after the time it leaves the hammer mill. This is correct. The price the Government contends would be $1.50 per ton for 1952 and $1.60 per ton for 1953.

The Government has contended that the Weaver Quarry is of like kind and grade under Regulations 118 (1939 Code), Section 39.23(m) –1(e) (3). United States v. Portland Cement Co., 315 F.2d 169 (10th Cir.) and Alabama By-Products Corp. v. Patterson, 258 F. 2d 892 (5th Cir.) are authority for that position.

The court finds that the price of the product contended for by the Government is correct. Under that price, no refund can be allowed. There is no evidence of any other price applicable under the law and regulations which is higher than that claimed for by the Government.

Accordingly, it will be Ordered that plaintiff's Complaint is dismissed at plaintiff's costs.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and order for judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.