**IOWA LIMESTONE COMPANY,**
Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 17936.

United States Court of Appeals
Eighth Circuit.

Aug. 10, 1966.

James Evans Cooney, Des Moines, Iowa, Darrell D. Wiles, St. Louis, Mo., for appellant.

Melva M. Graney, Attorney, Tax Division, Dept. of Justice, Washington, D. C., for appellee; C. Moxley Featherston, Acting Asst. Atty. Gen., and Lee A. Jackson, Chief Appellate Section, Washington, D. C., Donald M. Statton, U. S. Atty., on the brief.

Before MATTHES, MEHAFFY and GIBSON, Circuit Judges.

MATTHES, Circuit Judge.

This case involves the recurring problem of the amount of percentage depletion allowance to which a miner of chemical and metallurgical grade limestone is entitled for income tax purposes. The question was presented to us in Commissioner of Internal Revenue v. Iowa Limestone Company, (same taxpayer), 269 F.2d 398 (8th Cir. 1959), and in Bookwalter v. Centropolis Crusher Company, 272 F.2d 391 (8th Cir. 1959) (first appeal), 305 F.2d 27 (8th Cir. 1962) (second appeal).[1]

---

1. Subsequent to our decision in *Centropolis*, 272 F.2d 391 (8th Cir. 1959), and while the District Director's petition for rehearing was pending, the Supreme Court decided United States v. Cannelton Sewer Pipe Company, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960). In *Cannelton*, the Court rejected the profitability test which we applied in Commissioner of Internal Revenue v. Iowa Lime-

Involved in the prior *Iowa Limestone Company* case were taxable years 1950 and 1951. At issue in this case is the amount of income tax owed by taxpayer for the years 1952 and 1953. The District Director asserted, assessed, and collected income tax in the amount of $29,259.24 and $34,766.74 for the years 1952 and 1953 respectively. Claims for refund were disallowed and taxpayer filed this action for the purpose of recovering the amount in dispute. The issues were tried to the court without a jury. Judgment was duly entered dismissing the complaint and taxpayer has appealed. The court's memorandum opinion, which contains findings of fact and conclusions of law, is reported at 234 F.Supp. 278 (S.D.Iowa 1964).

The taxpayer, Iowa Limestone Company, is an Iowa corporation with principal offices located at 500 New York Avenue, Des Moines, Iowa. Its business consists primarily of the mining and processing of chemical grade limestone from its Alden, Iowa quarry, and the subsequent sale of its finished mineral product throughout Iowa and other contiguous states.

Taxpayer's mining operations consist in general of stripping the dirt overburden from the area of desirable limestone deposits and blasting the face of the quarry with explosives set in drill holes. The broken limestone is then loaded into trucks and hauled to a primary "jaw crusher" which reduces it to chunks of limestone which may vary in size from a tennis ball to a football or basketball. These pieces are carried into its plant by a belt conveyor where a secondary crushing process in hammer mills fur-

ther reduces the limestone in size. From the hammer mills, the limestone is then conveyed into roller mills which process the material into finely ground limestone—taxpayer's end product. Each roller mill has its own separate heating furnace which produces a steady flow of heated air to remove undesirable moisture inherent in the limestone. A stream of air from cyclone collectors located at the top of the roller mills vacuums the finished product into the bottom of each collector. Part of taxpayer's finely processed limestone is treated with chemicals to meet individual specifications of its customers and packaged in 50 and 100 lb. 3-ply paper bags. Other portions of the end product are either similarly bagged or shipped in bulk without such chemical additives.

In this appeal the government concedes that taxpayer's mineral product is chemical or metallurgical grade limestone and therefore entitled to a depletion allowance of 15 per cent.[2] A dispute, however, arises as to the "cut-off point" to be used in computing taxpayer's depletion basis. The Internal Revenue Code of 1939, § 114(b) (4) (B), as amended, 65 Stat. 497 (1951) controls disposition of the case at bar. Section 114(b) (4) (B) grants nonintegrated mining operators a depletion allowance based upon their "gross income from mining." The statute then continues:

"* * * The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also *the ordinary treatment processes normally applied by mine owners or operators in order to obtain the com-*

---

stone Company, supra. See 364 U.S. note 10, at 89, 80 S.Ct. 1581. In light of *Cannelton,* we vacated our holding in *Centropolis,* 272 F.2d 391 and reversed and remanded for further consideration by the District Court. On the second appeal we again affirmed.

2. Int.Rev.Code of 1939, § 114(b) (4) (A), as amended, 65 Stat. 497 (1951) provides:

"* * * Percentage depletion for coal and metal mines and for certain

other mines and natural mineral deposits.

"(A) In general. The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—
 * * * * *
"(iii) in the case of * * * metallurgical grade limestone, chemical grade limestone * * * 15 per centum
 * * * * *
"of the gross income from the property during the taxable year * * *."

*mercially marketable mineral product or products * * *."* (Emphasis added.)

The basic question for decision is whether the district court erred in holding that "mining" of chemical and metallurgical grade limestone, for percentage depletion purposes under Sec. 114(b) (4) of the Internal Revenue Code of 1939, terminates after the hammer mill process but before the roller mill process applied by the taxpayer. In the former *Iowa Limestone Company* case, supra, substantially the same issue was involved. Taxpayer contends, as it did before,[3] that it is entitled to percentage depletion from all income from the production of its finely ground chemical grade limestone because its processes are those normally applied by processors to obtain the commercially marketable product. The Government's position, on the other hand, is that the district court properly found on the facts and applicable law that the "cutoff point," for chemical and metallurgical limestone, was after the hammer mill process and before taxpayer's roller mill process.

■■ Resolution of these conflicting contentions requires a determination of what constitutes taxpayer's "commercially marketable product" and the "ordinary treatment processes" applied in the chemical limestone industry to attain that product. We note that these are essentially factual issues in any given situation. Due weight therefore must be given to the findings of fact of the district judge and his first-hand opportunity to observe and evaluate the credibility of the witnesses. We shall not be prone to set aside the district court's findings as clearly erroneous, unless reading the record as a whole, we are left with a firm and abiding conviction that a mistake has been made.

Upon the evidence presented, the district court made findings of fact to the effect that taxpayer's predominant use of its finely processed limestone as a feed additive is not one of the major uses of chemical or metallurgical grade limestone. The court found further that the three major uses of chemical and metallurgical limestone (calcined lime, metallurgical fluxing stone, and chemically grade stone for making glass) do not at all require a finely processed mineral in their production. From the foregoing factors, the district court concluded that taxpayer's method of finely processing its stone was not an "ordinary treatment process" within the ambit of § 114(b) (4) (B) and therefore disallowed taxpayer's fine grinding as a permissible "mining" process.

We do not arbitrarily attempt to determine the permissible limits of § 114(b) (4) (B), as applied to the chemical or metallurgical limestone industry. The Supreme Court in recent years has provided broad guidelines in this area of the law. We shall briefly review the teachings of its decisions.

In its landmark case, United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581 (1960), the Supreme Court held that taxpayer's "gross income from mining" under § 114(b) (4) (B) included the value of income derivable from its raw clay and shale as opposed to income from its end product vitrified sewer tile. From an analysis of the legislative history behind § 114, the Court concluded that:

> "Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles.
>
> \* \* \* \* \* \*
>
> " * * * [W]hen extracted from the mine, the fire clay and shale are in such a state that they are ready for industrial use or consumption—in short, they have passed the 'mining' state on which the depletion principle operates. It would be strange, indeed, to ascribe to Congress an intent to permit each miner to adopt processes peculiar to his individual operation. De-

3. 269 F.2d 399, 400.

pletion, as we have said, is an allowance for the exhaustion of capital assets. It is not a subsidy to the manufacturer or the high-cost mine operator * * *" Ibid. at 86, 80 S.Ct. at 1586.

Similarly in Riddell v. Monolith Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963), the Supreme Court reaffirmed the guiding principles set forth in *Cannelton*. At issue in *Monolith* was the depletion "cut-off point" of an integrated miner-manufacturer of limestone who processed crushed limestone into a finished cement product. The Court found *Cannelton* directly applicable and held that the depletion allowance due an integrated mining operator should be initially cut off at the point where the mineral first becomes suitable for industrial use or consumption. The Court concluded that this point was reached at the crushed limestone stage. Taxpayer's depletion basis thus represented its constructive income from crushed limestone, rather than from its finished cement product.

Of particular significance in each of these cases was the fact that there existed a substantial market for the raw mineral product involved. In *Cannelton* three-fifths of the fire clay mined in Indiana in 1951 was sold in its raw state, even though taxpayer could not profitably market it in that form. 364 U.S. at 86, 80 S.Ct. 1581. Similarly in *Monolith*, approximately 216,000,000 out of 300,000,000 tons of limestone sold in 1952 were marketable in crushed form, though taxpayer chose not to market its crushed limestone until a later more profitable processing stage. See 371 U.S. note 2, at 539, 83 S.Ct. 378. In each of these cases, the Supreme Court concluded that the raw mineral product was the first "commercially marketable product" fit for industrial consumption within the meaning of § 114, and consequently, the income derivable therefrom formed the basis of taxpayer's percentage depletion allowance.

We construe these and other post-*Cannelton* decisions [4] as evincing a tendency to limit the depletion allowance under § 114 to the constructive income from the earliest processing stages of the raw mineral product, if there be factual verification of its commercial marketability at that point. The evidence tendered in the case at hand adequately discloses a commercial market for chemical (or metallurgical) grade limestone prior to taxpayer's fine grinding processes, and we therefore affirm the findings of the district court in this regard. See Riddell v. Victorville Lime Rock Co., 292 F.2d 427 (9th Cir. 1961).[5]

---

4. See, e. g., United States v. Light Aggregates, Inc., 343 F.2d 429 (8th Cir. 1965) (taxpayer's raw shale was its first product fit for industrial use and consumption under the rationale of the *Cannelton* case, despite the fact that taxpayer did not sell shale in its raw state);

Virginia Greenstone Co. v. United States, 308 F.2d 669 (4th Cir. 1962) (taxpayer's quarry greenstone rather than sand finished stone held to be its first commercially marketable product despite lack of active market for quarry stone, where taxpayer controlled the only source of supply and delayed disposition until a more refined stage);

Commissioner v. Halquist, 291 F.2d 49 (7th Cir. 1961) (depletion allowance based on taxpayer's receipts from sale of crushed stone, rather than finished veneered stone, even though taxpayer could not economically process it in its rough uncut state);

Standard Realization Co. v. United States, 289 F.2d 247 (7th Cir. 1961) (taxpayer's first commercially marketable product held to be crude unwashed silica sand prior to grinding and bagging processes where facts disclosed a substantial market for the raw mineral product);

Morton Salt Company v. United States, 316 F.2d 931, 161 Ct.Cl. 640 (1963) (rock salt, rather than processed granulated or grainer salt, held to be taxpayer's first commercially marketable product, notwithstanding the fact that taxpayer produced a very low percentage of rock salt for sale prior to its fine processing).

5. In *Victorville*, taxpayer, also a miner of chemical grade limestone, contended that its fine grinding processes were "ordinary treatment processes" within section 114 necessary to obtain a commercially marketable product. There, as here, finely ground limestone constituted

■■ Within the chemical or metallurgical limestone branch of the mining industry, the Government has adduced sufficient evidence to show an industry-wide market for chemical grade limestone after the secondary crushing process in the hammer mills.[6] We conclude therefore that § 114(b) (4) (B), interpreted in the light of *Cannelton*, requires us to disregard the peculiar operations of taxpayer, in determining the "cut-off point" under the depletion statute. The "cut-off point" of commercial marketability must be uniformly applied throughout the chemical and metallurgical branches of the mining industry. To hold otherwise would be to allow taxpayer a windfall recovery of his high-cost, highly refined mining operations rather than an allowance for the exhaustion of his wasting assets.

■ Despite the guiding pronouncements of the Supreme Court in *Cannelton*, and their reaffirmation in *Monolith*, taxpayer nevertheless urges upon us that our opinion in Bookwalter v. Centropolis Crusher Company, 305 F.2d 27, is determinative of the case at bar. We do not agree. When we remanded the first *Centropolis* case for further consideration by the district court in the light of *Cannelton* (281 F.2d 799), we did so well aware of the numerous factors which may determine the "cut-off point" for allowable "ordinary treatment processes" under § 114. We noted there that when the mineral product is commercially marketable is of determinative significance and depends on the factual situation at hand. We further realize that the Supreme Court's summary reversal of Riddell v. Monolith Portland Cement Company, 301 F.2d 488 (9th Cir. 1962), up-

on which we relied as authority in affirming *Centropolis*, severely limits the authoritative force of our holding in that case. We therefore do not regard it as dispositive of the case at hand. United States v. Light Aggregates, Inc., supra.

■ Moreover, the record in the present case represents a marked improvement over that produced in *Centropolis*, where we upheld the taxpayer's contention that its crushing and fine grinding processes were "ordinary treatment processes" applied by metallurgical or chemical limestone miners in order to obtain their marketable product. Unlike *Centropolis*, however, the record evidence here amply supports the district court's finding that there is a commercial market for chemical grade limestone during the interim between taxpayer's hammer mill and roller mill processes. The fact that taxpayer has seen fit not to avail itself of this market, but has chosen to dispose of its product at a more profitable stage of refining is of no consequence to the determination of this appeal. United States v. Longhorn Portland Cement Company, 328 F.2d 491 (5th Cir. 1964); Standard Realization Co. v. United States, 289 F.2d 247 (7th Cir. 1961). The individual mining operations of a particular owner or operator are not determinative. We believe that *Cannelton* prescribes an objective, industry-wide standard to determine the "cut-off point" for "mining" within § 114. Virginia Greenstone Co. v. United States, 308 F.2d 669 (4th Cir. 1962); Riddell v. Victorville Lime Rock Co., 292 F.2d 427 (9th Cir. 1961); Commissioner of Internal Revenue v. Halquist, 291 F.2d 49 (7th Cir. 1961). See also Food Machinery and Chemical Corp. v. United States, 348

---

the bulk of taxpayer's operations and there also the taxpayer contended that its limestone could not have been commercially marketed at any earlier stage of processing because of high economic cost and lack of a commercial market in taxpayer's area. The Ninth Circuit reversed and remanded in light of *Cannelton*.

6. Several of the government witnesses testified to the effect that finely ground

"pulverized" limestone was unsuitable for the major industrial uses of that stone and that limestone is customarily sold in larger sizes for such chemical and metallurgical uses. Government Exhibits, taken from the Bureau of Mines Mineral Yearbooks, 1952 and 1953, succinctly point out the commercial marketability of limestone in crushed form.

F.2d 921 (Ct.Cl.1965). Consequently taxpayer's additional refining processes will not alter that "cut-off point."

As an additional argument in its arsenal, taxpayer strongly contends that proper application of Revenue Ruling 62–5 to the case at bar compels a different conclusion than the one we have reached. We do not agree. On the contrary, properly interpreted, Revenue Ruling 62–5 militates against taxpayer's position and leads us to the conclusion that taxpayer's finely ground limestone comes within the term "pulverization" as defined within that ruling.

Revenue Ruling 62–5 represents the culmination of several Treasury rulings in the area of percentage depletion. The initial Treasury position in regard to the depletion allowance due chemical grade limestone was that the production of "pulverized limestone" as a by-product of primary and secondary crushing did not exclude such processes from inclusion as "ordinary treatment processes" within § 114(b) (4) (B). The pulverization of limestone in the production of agricultural limestone, however, was explicitly excluded from coverage as "ordinary treatment processes." Rev.Rul. 56–405, 1956–2 Cum.Bull. 332.

Following the Supreme Court's decision in *Cannelton,* the Treasury Department modified its former position expressed in Rev.Rul. 56–405 to exclude all processes subsequent to primary crushing as "ordinary treatment processes." Rev.Rul. 61–17, 1961–1 Cum.Bull. 193. Revenue Ruling 62–5 represents a compromise position in the interest of administrative uniformity to accommodate the sundry size reduction processes utilized by various mine operators. It states simply that " * * * processes, *other than fine pulverization,* applied for size reduction purposes will be treated as 'ordinary treatment processes' in the case of the minerals described in Rev. Rul. 56–405 (chemical grade limestone and metallurgical grade limestone). * * * " (Emphasis added.) Excluded from the term "fine pulverization", however, is the coincidental production of

fines as a by-product of allowable size reduction processes and also any process applied to reduce the product in size so that it will pass a No. 20 screen (U. S. Standard Sieve Series), provided five percent or more of the product will remain on a No. 45 screen. Rev.Rul. 62–5, 1962–1 Cum.Bull. 88.

Taxpayer contends that in as much as four out of its seven products ("D" grind, Coarse Barnlime, Regular Barnlime, and Litterlite) satisfy the screen test set forth in Revenue Ruling 62–5 and in as much as all of its products receive the same processing in its roller mill with only minor adjustments in machinery, depletion should therefore be allowed in full on those products qualifying under the screen test, while products beyond the "cut-off point" ("58", Alden, and Mineral Filler) should be valued at the same price as the last product qualifying under the screen test. Taxpayer's argument, however, is not persuasive in our mind, for it seeks to apply the screen test of Rev.Rul. 62–5 to each of its seven products individually rather than as a single, unified product emanating from the roller mill process. There is no dispute that, considered as one end product, taxpayer's finely ground limestone, upon emergence from its roller mill processing, will not satisfy the 5% requirement of Rev.Rul. 62–5's screen test. Moreover, we fully concur with the conclusion of the district court that taxpayer's finely ground products (Alden, "58," and Mineral Filler) are not coincidental by-products of allowable size reduction processes. On the contrary, taxpayer's refining processes seem primarily geared to the production of its finely ground "Alden grind" chemical grade limestone which outsells its other products by almost a 4:1 margin and which concededly fails to meet the specifications of the Treasury screen test. For the foregoing reasons we therefore reject taxpayer's contention that Rev.Rul. 62–5 should warrant a contrary result in this case.

Taxpayer's final contention is that the district court erred in applying a

representative market price of a mineral product of like kind and grade to determine its depletion allowance since it had actual sales of its finely ground products upon which its depletion allowance could be computed. Taxpayer's argument is inapposite in this context, however, for it fails to correlate its actual sales with the proper "cut-off point" for the depletion allowance. Actual sales have relevancy only if they occur at or near the "cut-off point." Absent such a showing (as here), the depletion allowance must be computed on the constructive income from taxpayer's first commercially marketable raw mineral product. United States v. Cannelton Sewer Pipe Co., supra. Treasury Regulation 118, 39.23 (m)–1(e) (3) provides in pertinent part that:

> "if the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine, 'gross income from the property' means the amount for which such product is sold, but, if the product is transported or processed (other than by the ordinary treatment processes described below) before sale, 'gross income from the property' means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied. * * *"

■ We construe this section as determinative of taxpayer's contention. Representative prices are to be used in the absence of pertinent actual sales. Ames v. United States, 330 F.2d 770 (9th Cir. 1964); Alabama By-Products Corporation v. Patterson, 258 F.2d 892 (5th Cir. 1958), cert. denied, 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303 (1959). Moreover, we find ample evidence in the record to substantiate the district court's finding that chemical grade limestone produced from the adjoining Weaver quarry was of such like kind and grade as taxpayer's as to afford an adequate basis for computation of a representative market price.

Considering the record as a whole we are thoroughly convinced that the district court's findings were not induced by an erroneous view of the law. The judgment of the district court is accordingly affirmed.