**WOODVILLE LIME PRODUCTS COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**OHIO LIME COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Nos. 8131, C. 62–170.

United States District Court
N. D. Ohio, W. D.

Dec. 30, 1966.

312

Shumaker, Loop & Kendrick, Toledo, Ohio, for plaintiff Woodville Lime Products Co.

Doyle, Lewis & Warner, Toledo, Ohio, for plaintiff Ohio Lime Co.

John G. Mattimoe, Asst. Dist. Atty., Toledo, Ohio, Thomas Field, Department of Justice, Washington, D. C., for defendant.

DON J. YOUNG, District Judge.

During what geologists call the Silurian Period of the Paleozoic Era, a substantial portion of the north-central United States was covered by an inland sea. On the bottom of that sea lived minute organisms which extracted carbonate minerals from the waters and secreted them in their own hard parts. The remains of these organisms—shells and skeletons—formed vast deposits of stone. Some 350 million years later men began to quarry this stone for the production of lime, fluxing stone, refractory materials, fillers and agricultural and other materials. In 1951 Congress added numerous minerals to the percentage depletion statutes and since that time the interpretation and application of these statutes has been the subject of much litigation in this and other courts.

In this consolidated suit plaintiff Ohio Lime Company seeks refunds of excess profits taxes for the years 1950 through 1953, inclusive, and refunds of income taxes for the years 1950 through 1957, inclusive. Plaintiff Woodville Lime Products Company seeks refunds of income and excess profits taxes for the years 1951 through 1953, inclusive.

Initially these suits raised the interesting issue of the rate of depletion applicable to the taxpayers' mineral product for the years 1950 through 1953. The taxpayers contended that their products were chemical or metallurgical grade limestone and thus they were entitled to a depletion rate of 15%. On September 25, 1963, Judge Frank L. Kloeb entered a partial summary judgment order adverse to the Ohio Lime Company, finding that the taxpayer's product was dolomite as that term is used in section 114(b) (4) (A) (ii) of the Internal Revenue Code of 1939, as amended, and thus a 10% rate of depletion is applicable. Ohio Lime Co. v. United States, 219 F.Supp. 146 (N.D.Ohio 1963). A similar order was entered in the Woodville case on September 30, 1965.

As to the years subsequent to 1953, the rate question is moot. The 1954 Internal Revenue Code classifies all carbonate rocks at a 15% rate. 26 U.S.C. § 613(b) (6) (1964).

The remaining question for decision requires a determination of the "gross income from the property" of the taxpayers as those words are used and defined in section 114 of the Internal

Revenue Code of 1939, as amended,[1] and section 613 of the 1954 Internal Revenue Code, 26 U.S.C. § 613 (1964).[2] This issue was tried to the Court from February 23, 1966 to March 3, 1966. The case is now submitted to the Court on the pleadings, two stipulations, the trial transcript comprising 1278 pages, 103 exhibits and voluminous post-trial briefs.

The taxpayers are integrated mining-manufacturers. Their quarries and plants are located within a mile and a half of each other in or near the village of Woodville, Ohio.

### OHIO LIME COMPANY

The Ohio Lime Company, known as the Ohio Hydrate and Supply Company prior to April 30, 1954, is an Ohio corporation with its principal office in Woodville, Ohio. For the years in question the taxpayer's quarry covered about 50 to 60 acres to a maximum depth of 70 feet.

Ohio Lime's mining process begins by stripping from 6 to 8 feet of overburden from the stone deposit. The stone surface is then cleaned by means of brooms and other tools in order to avoid contamination of the mineral rock. A series of holes is drilled and filled with explosives, and a portion of the rock is then blasted to the quarry floor. Sometimes secondary blasting is required to reduce the larger pieces to manageable size. The stone is then transported by truck to the primary crusher. The subsequent

---

1. SEC. 114. Basis for Depreciation and Depletion.

    \*　　\*　　\*　　\*　　\*

    (b) *Basis for depletion.—*

    \*　　\*　　\*　　\*　　\*

      (4) *Percentage depletion for coal and metal mines and for certain other mines and natural mineral deposits.—*

        (A) *In general.—*The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

        \*　　\*　　\*　　\*　　\*

          (ii) in the case of \* \* \* dolomite \* \* \* 10 per centum,

          (iii) in the case of \* \* \* metallurgical grade limestone, chemical grade limestone \* \* \* 15 per centum \* \* \*.

        \*　　\*　　\*　　\*　　\*

        (B) *Definition of gross income from property*—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining" as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products \* \* \*.

2. SEC. 613. Percentage Depletion.

    (a) *General Rule.—*In the case of the mines, wells, and other natural deposits, listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property \* \* \*.

    (b) Percentage Depletion Rates.—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

    \*　　\*　　\*　　\*　　\*

      (6) 15 percent—all other minerals (including, but not limited to \* \* \* dolomite) \* \* \*.

    (c) *Definition of Gross Income from Property.—*For purposes of this section—

    \*　　\*　　\*　　\*　　\*

      (2) *Mining.—*The term "mining" includes not merely the extraction of the ores or minerals from the ground but also the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto), and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which such treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills.

processing which took place in the years 1950 through 1957 is described diagramatically in the following flow chart.

FLOW CHART
OHIO LIME COMPANY

The primary crusher reduced chunks with a top size of 5–7 feet to a top size of about 7–10 inches. The crushed stone then passed over a screen with openings 4 inches square when the screen was new, but which might expand to 5 inches when worn. The minus 7–10 inch, plus 4 inch stone which rode over the screen was sent to two bins. Stone of this size is referred to as kilnstone and is the first "product" in Ohio Lime's process. A portion of this kilnstone was sold; much of it was used in Ohio Lime's vertical lime kilns.

It should be noted at this point that for every 4 tons of rock quarried, Ohio Lime recovered approximately one ton of kilnstone; the other three tons passed through the 4 inch screen. The ratio of kilnstone to total stone varied among the producers which testified from 1:5 to 1:2. Differences in crushing apparatus, primary screen sizes, and the cleavage properties of the stone no doubt accounted for this broad variation.

Returning now to the stone which passed through the primary screen, that is, the minus 4 inch stone, a system of recrushing and secondary screening produced several classifications. Stone of a top size of 4 inches, bottom size 2 inches, was sometimes sold as blast furnace flux but more commonly, this size was reduced further. Stone of a top size of 2 inches, bottom $3/4$ inches, was sometimes sold as open hearth refractory dolomite.

Stone which passed through the $3/4$ inch screen was transferred to a $3/16$ inch screen. Material which passed through was transferred to the dried stone plant. Up to this point no water was added to the system.

Stone which rode over the $3/16$ inch screen, described above, was transferred to the "wet side" of the screen house. In this part of the process water was poured over the stone and screens for the purpose of removing stone dust which adhered to the stone particles. Stone which passed through the wet $3/8$ inch screen but remained on the wet $3/16$ inch screen became feed for Ohio Lime's refractory dolomite kilns.

The residue of the wet side, that is, the minus $3/16$ inch material was fed to a hydraulic sand classifier. The classifier separated out the finer particles which were sold as "DUSO," an agricultural limestone, or dumped. The larger particles were sent to the aforementioned dried stone plant.

The foregoing provides a quick overview of the mining to crusher to screen house process. Large chunks of stone are charged in at one end of the system and various products—some intermediate products and some end products—are discharged at different points. The following summary indicates the tonnage produced in 1951, a fairly typical year:

| PRODUCT | TONS |
| --- | --- |
| Transfers: | |
| Kilnstone to Lime Kilns | 181,027 |
| Stone to Dead Burned Dolomite Kilns | 198,272 |
| Stone to Dryer Plant | 123,401 |
| Sales: | |
| Kilnstone | 6,257 |
| Open-hearth Refractory | 5,876 |
| Chemical Stone | 92,285 |
| Agricultural Stone | 11,552 |
| Construction Stone | 1,470 |
| TOTAL | 620,140 |

Further processing is required in the manufacture of burnt lime, dead burned dolomite, and dried stone products.

In the manufacture of burnt lime, plus 4 inch kilnstone is charged into vertical shaft kilns and heated to temperatures

in excess of 2,500 degrees Fahrenheit. The size of the stone is critical because small pieces tend to clog the interstices through which the hot gases must circulate. Carbon dioxide gas is driven off in the process and the consequent chemical changes produce a product known as burnt lime.

Dead burned dolomite is manufactured in a similar manner. Minus $3/8$ inch, plus $3/16$ inch washed stone is charged into kilns, heated, and impregnated with approximately seven per cent iron oxide. Washed stone feed is necessary because adhering dust tends to fuse at an early stage in the process and thus impede the flow of material through the kiln.

Ohio Lime's dried stone plant received two streams of material, as indicated on the flow chart. Dry minus $3/16$ inch screenings, joined by wet minus $3/16$ inch screenings, were fed into two rotary dryers. The dryers were heated by a coal fired furnace to a temperature of 1200 degrees Farenheit, the stone reaching a temperature of about 250 to 300 degrees in its 10–15 minute pass through the dryers. After drying, the stone was fed to a Symons Cone Air Classifier which segregated the finer particles from the coarser particles by means of a continuous blast of hot air. The finer material, known as OHSO, was sold for agricultural use. Coarser particles of 20 mesh by 80 mesh, 10 mesh by 30 mesh, etc., as shown on the flow chart, were sold as glass flux to the glass industry. Finally, a third category of still coarser material, plus ten mesh, was fed to two Raymond Roller Mills. Grinding and fine pulverization then reduced this material to a point at which 97% was minus 300 mesh. This material was sold for use as rubber filler.

## WOODVILLE LIME COMPANY

The Woodville Lime Company, now known as the Woodville Lime and Chemical Company, is an Ohio corporation with its principal office in Toledo, Ohio. During the years in question, Woodville's quarry covered about 83 acres to a depth of from 60 to 90 feet.

Woodville's production processes were considerably less complicated than those of Ohio Lime. After the usual mining operations Woodville reduced its stone to a top size of about 9 inches by means of a primary crusher. Kilnstone of a top size of 9 inches and bottom size of 6 inches was conveyed to kilns for making lime. For each ton of kilnstone produced, about two tons of minus 6 inch stone resulted. Minus 6 inch stone was screened and recrushed for sale as blast furnace flux, open hearth refractory, agricultural stone and construction stone.

Agricultural stone was manufactured by grinding size classifications which the company found unmarketable, such as stone of a top size of 1½ inches, bottom ¾ inches, to a top size of $9/32$ inches. Construction stone was marketed in many size classifications; the predominant sizes were $-4'' +2''$ and $-\frac{3}{4}'' +\frac{1}{4}''$.

The following figures reflect Woodville's production for the year 1952, a fairly representative year:

| PRODUCT | TONS |
|---|---|
| Transfers: | |
|     Kilnstone to Lime Kilns | 180,792 |
|     Stone to Fertilizer Division | 5,810 |
| Sales: | |
|     Blast Furnace Stone | 41,203 |
|     Chemical Stone | 67,250 |
|     Open Hearth Refractory | 50,065 |
|     Construction Stone | 150,526 |
|     Agricultural Stone | 17,980 |
| TOTAL | 513,626 |

In Woodville's fertilizer division the screenings which resulted from the company's normal reduction operations were heated and passed through a 6-mesh screen on an angle. The resulting minus 6-mesh material was used as fertilizer filler. Approximately three tons of screenings were required to obtain one ton of filler material.

## I. VARIANCE

The first question for decision is the rather technical one of whether the issue of the location of taxpayers' mining cut-off point, i. e., the point in taxpayers' operation where mining ends and manufacturing begins, is in this case or not. The government contends that the claims for refunds filed by each of the taxpayers establish the mining cut-off point at the end of primary crushing and screening. In the government's view, the taxpayers' claims for refund failed to raise the claims now made, namely, that certain processes beyond primary crushing and screening are mining processes, and therefore such claims should not now be heard.

The taxpayers vigorously oppose any such reading of their claims for refund and assert that the government has known from the beginning the nature of their claims. The minute detail with which the government has explored every facet of the taxpayers' businesses, before and during trial, is pointed to as evidence of "the clear struggle between the parties." [3]

Having given careful consideration to the language of the claims and the applicable law, the Court is satisfied that the claims for refund put the Commissioner "on notice of the ground of the taxpayer's claim," National Forge & Ordnance Co. v. United States, 151 F.

Supp. 937, 941, 139 Ct.Cl. 204 (1957), or in other words, such grounds as are now asserted by the taxpayers are within the "scope of the grounds for refund asserted in [their] * * * claim filed with the Commissioner." Carmack v. Scofield, 201 F.2d 360, 362 (5th Cir. 1953).

## II. DEPLETION CUT-OFF POINT

In view of the foregoing rejection of the government's technical objections, it now becomes necessary to determine the point in taxpayers' operations where the mining process ceases and the manufacturing process begins.

Section 114(b) (4) (B) of the Internal Revenue Code of 1939, as amended, defines the term "mining" as including "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." [4] Section 613(c) of the 1954 Code contains a corresponding provision. The question of what are the "ordinary treatment processes" of miners in various factual circumstances has been the subject of much litigation [5] and has caused the Commissioner to review and redefine his position on at least two occasions.

The Supreme Court has construed section 114 and in so doing considered the larger question of the nature of the depletion statutes. Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963); United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960). In *Cannelton*, the Court held that the taxpayer's mining activities ended when the taxpayer extracted its raw clay and shale from the mine. The Court determined that the vast sales of the raw product

3. Plaintiff Ohio Lime Reply Post-Trial Brief, p. 3.

4. See Footnote 1, supra.

5. See, e. g., Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct. 378 (1963); United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581 (1960); Iowa Limestone Co. v. United States, 365 F.2d 63 (8th Cir. 1966); Food Machinery and Chem. Corp. v. United States, 348 F.2d 921 (Ct.Cl.1965); United States v. Light Aggregates, Inc., 343 F.2d 429 (8th Cir. 1965); Morton Salt Co. v. United States, 316 F.2d 931, 161 Ct.Cl. 640 (1963); Virginia Greenstone Co. v. United States, 308 F.2d 669 (4th Cir. 1962).

in the vicinity was conclusive of the "commercial marketability of the product" in its raw state and hence any subsequent processing would be regarded as non-mining activity even though the taxpayer could operate profitably only if it applied such subsequent processing. The peculiarities of operation of a particular taxpayer are to be ignored, according to the Court, for the depletion allowance "was designed not to recompense for costs of recovery but for exhaustion of mineral assets alone. If it were extended as * * * [the taxpayer] asks, the miner-manufacturer would enjoy, in addition to a depletion allowance on his minerals, a similar allowance on his manufacturing costs, including depreciation on his manufacturing plant, machinery and facilities." United States v. Cannelton Sewer Co., supra, 364 U.S. at 88, 80 S.Ct. at 1588.

In *Monolith* the Court held that the cut-off point for an integrated limestone-to-cement miner-manufacturer was reached at the crushed limestone stage. The Court reaffirmed the *Cannelton* teaching that the "statutory percentage depletion allowance on the gross income of an integrated mining operator should be cut off at the point where the mineral first became suitable for industrial use or consumption." Riddell v. Monolith Portland Cement Co., supra, 371 U.S. at 538, 83 S.Ct. at 379.

Applying the teaching of these cases to the taxpayers' activities it appears plain that the taxpayers' mining ends at the crushed stone stage. The record shows substantial sales of crushed stone by miners in the Northwestern Ohio area. For the years in question the nine firms from which the government obtained sales figures sold a volume of blast furnace stone (minus 4 inches, plus 2 inches) which ranged from 517,939 tons in 1954 to 1,013,194 tons in 1953. Sales of raw open hearth dolomite [6] ranged

from 342,518 tons in 1954 to 548,408 tons in 1956. Sales of such a substantial tonnage of crushed stone indicates conclusively the "commercial marketability" of crushed stone and hence the cessation of the "ordinary treatment processes" at the crushed stone stage.

Despite the clear applicability of *Cannelton* and *Monolith* to the taxpayers' operation, taxpayers argue vigorously that Rev.Rul. 62–5, 1962–1 Cum.Bull. 88, somehow compels a different result. Rev.Rul. 62–5 is the most recent of a series of rulings dealing with the production of stone products. The history of these rulings was recently summarized by the Eighth Circuit Court of Appeals:

"Revenue Ruling 62–5 represents the culmination of several Treasury rulings in the area of percentage depletion. The initial Treasury position in regard to the depletion allowance due chemical grade limestone was that the production of 'pulverized limestone' as a by-product of primary and secondary crushing did not exclude such processes from inclusion as 'ordinary treatment processes' within § 114(b) (4) (B). The pulverization of limestone in the production of agricultural limestone, however, was explicitly excluded from coverage as 'ordinary treatment processes.'" Rev.Rul. 56–405, 1956–2 Cum.Bull. 332.

"Following the Supreme Court's decision in *Cannelton*, the Treasury Department modified its former position expressed in Rev.Rul. 56–405 to exclude all processes subsequent to primary crushing as 'ordinary treatment processes.' Rev.Rul. 61–17, 1961–1 Cum.Bull. 193. Revenue Ruling 62–5 represents a compromise position in the interest of administrative uniformity to accommodate the sundry size reduction processes utilized by various mine operators. It states simply that '* * * processes, other than fine

6. Open hearth dolomite is marketed in a wide variety of size classifications. For instance, Armco Steel purchased —3/8″ +4— mesh; Youngstown Sheet and Tube purchased —3/4″ + 1/4″; —1/2″ +8—

mesh; and —3/8″ +1/4″. Basic Incorporated sold four classifications for open hearth use: —11/2″ +3/4″; —3/4″ +3/8″; —3/8″ +4—mesh; and —4— mesh +28—mesh.

*pulverization,* applied for size reduction purposes will be treated as "ordinary treatment processes" in the case of the minerals described in Rev.Rul. 56–405 (chemical grade limestone and metallurgical grade limestone). * * * ' (Emphasis added.) Excluded from the term 'fine pulverization', however, is the coincidental production of fines as a by-product of allowable size reduction processes and also any process applied to reduce the product in size so that it will pass a No. 20 screen (U. S. Standard Sieve Series), provided five percent or more of the product will remain on a No. 45 screen. Rev.Rul. 62–5, 1962–1 Cum. Bull. 88." Iowa Limestone Co. v. United States, 365 F.2d 63, 69 (8th Cir. 1966).

Plaintiff Ohio Lime claims that proper application of Rev.Rul. 62–5 results in two cut-off points [7] for stone which passes through the primary screen: (1) minus ⅜", plus ³⁄₁₆" stone from the wet side of the screen house prior to its entry into the refractory rotary kilns, and (2) dried stone prior to its entry into the Raymond Roller Mills. Plaintiff concedes that physical and chemical changes occur in the refractory rotary kilns and that fine pulverization takes place in the roller mills and thus these operations are non-mining processes within the meaning of Rev.Rul. 62–5.

With regard to stone transported to Ohio Lime's drying plant (and Woodville's fertilizer division), it is claimed that drying is an ordinary treatment process which is necessary to accomplish proper screening and separating of various sizes prior to fine pulverization. The answer to this contention has already been given: crushed stone is marketable prior to drying and therefore according to the dictates of *Cannelton* and *Monolith* drying may not be considered an ordinary treatment process. Moreover, it is clear that the drying process effects a release of the natural internal moisture of the stone, thus causing a physical change in the stone. For this additional reason, it must be concluded that mining ends before stone reaches Ohio Lime's drying plant (and Woodville's fertilizer division).

■ With regard to stone on the wet side of the screen house, Ohio Lime argues that washing is merely an incidental process which accompanies the size-reduction operation. The same answer applies: the —¾" +³⁄₁₆" stone transferred to the wet side is commercially marketable [8] before washing and therefore washing may not be considered an ordinary treatment process. If uniformity in application of the depletion statutes is to be attained, then the peculiarities of operation of an individual miner must be ignored. United States v. Cannelton, supra, 364 U.S. at 86, 80 S.Ct. 1581. Rev. Rul. 62–5 cannot be read to yield a contrary result.

## III. GROSS INCOME FROM MINING

■ The taxpayers sold some of their stone in crushed form. As to these sales, the taxpayers' gross income from mining is the dollar amount of their sales. Treas.Reg. 118, § 39.23(m)–1(e) (3).

■ However, substantial quantities of stone were retained by the taxpayers for further processing. It therefore becomes necessary to ascertain whether there was a field or market price in Northwestern Ohio, during the years in controversy, for a mineral product of like

---

7. There is no disagreement among the parties as to the cut-off point for kiln-stone. The burning of stone results in obvious chemical and physical changes and thus mining ends after the primary crushing and screening operation.

8. Woodville, for instance, made the following sales of open-hearth refractory:

| Size | Tons | | |
|---|---|---|---|
| | 1951 | 1952 | 1953 |
| —3/4" +1/4" | 46,112 | 49,105 | 54,039 |
| —3/8" +3/32" | 4,394 | 960 | 1,980 |

For other saleable size classifications see footnote 6, supra.

kind and grade with the stone which taxpayers retained for their own use. All parties appear to agree that such a field or market price may be found and thus the proportionate profits method need not be resorted to. The parties disagree, however, on what the market price is.

## A. Like Kind and Grade

The Ohio Lime and Woodville quarries are located in what is known as the Niagaran Dolomite Formation. The approximate shape of the Niagaran dolomite outcrop in Northwestern Ohio is shown on the following outcrop map.

The quarries shown on the map are those for which data was introduced at trial.

All of the stone in the Niagaran Formation has a common origin. It is therefore not surprising that stone from one quarry is almost indistinguishable, physically and chemically, from stone of another quarry. Thus, x-ray diffractograms prepared by the government's expert geologist indicate that the stone in all eleven quarries is dolomite.

As to "like grade", various chemical analyses gathered from the producers themselves, the government's expert, and independent published sources show that the dolomite produced from the eleven quarries is a high purity dolomite of uniform grade. Moreover, the trial record clearly indicates that stone produced at any of the quarries is suitable for making the taxpayers' primary products: burnt lime, dead burned dolomite, fillers, agricultural soil conditioners, and glass flux.

In sum, it is clear that stone produced by other quarries in the Niagaran Formation is of like kind (dolomite) and of like grade (dolomite of high purity suitable for making the taxpayers' primary products) with stone mined from the taxpayers' quarries. Any ascertainable differences are of no commercial significance.

### B. Representative Field or Market Price

The constructive value of stone which the taxpayers used in their own production depends to some extent on the size of the stone.

Kilnstone is the taxpayers' first useable product and in many ways presents the greatest difficulty in the search for a constructive value. Only a very small amount of the kilnstone produced by the taxpayers was sold to outsiders. For the years in question Ohio Lime sold and used in its own production the following tonnages of kilnstone:

|      | TONS PRODUCED | TONS SOLD | PERCENTAGE SOLD |
|------|---------------|-----------|-----------------|
| 1951 | 187,284       | 6,257     | 3.3             |
| 1952 | 183,029       | 5,861     | 3.2             |
| 1953 | 153,668       | 5,609     | 3.6             |
| 1954 | 148,570       | 7,501     | 5.0             |
| 1955 | 147,105       | 6,476     | 4.4             |
| 1956 | 163,876       | 13,594    | 8.3             |
| 1957 | 144,031       | 13,304    | 9.2             |

Ohio Lime received a price of $1.7857 (hereafter $1.79) per net ton for the above sales of kilnstone and it is this price which the taxpayers contend should be used as the representative field or market price for the tonnages of kilnstone retained for making burnt lime.

Ordinarily one might presume that actual sales would furnish a proper basis for determining a constructive price for unsold materials. However, as this case makes clear, the nature of the market in which those sales occurred must be explored before any conclusion can be drawn regarding the "representativeness" of actual sales.

All of Ohio Lime's sales of kilnstone were made to the Hammermill Paper Company at Erie, Pennsylvania. Dolomite was an essential raw material in Hammermill's process. The purchased kilnstone was combined with high-calcium limestone, water and sulphur dioxide gas to produce a cooking acid used in the sulfite process of paper-making. The sums expended for kilnstone represented a relatively small part of Hammermill's overall pulping costs.

It is clear from the testimony of Hammermill's purchasing agent that the company's stone purchases were relatively insensitive to price changes. Dolomite requirements were dictated by paper production needs, not kilnstone price.

In view of the foregoing facts the Court is of the opinion that the price contended for by the taxpayers is not a representative field or market price for the kilnstone used in the production of burnt lime. First, the tonnage which brought $1.79 constituted a small percentage of the tonnage produced. Tonnage sold amounted to about 1% of Ohio Lime's total quarry output and, as shown in the above chart, averaged 5.3% of Ohio Lime's kilnstone output. Woodville sold no kilnstone to outsiders during the years 1951 to 1953, the years for which it claims refunds.[9]

No proof has been made of other sales of kilnstone by Northwestern Ohio miners. Consequently, the percentage of Northwestern Ohio kilnstone sales to total Northwestern Ohio kilnstone output was miniscule, at best, and there-

---

**9.** In 1958, Woodville made some sales to Hammermill for a short period of time when Ohio Lime had a strike. At the time of trial Woodville was selling about 10,000 tons annually to the Scott Paper Company of Detroit. (Tr. 530)

fore such sales were too small to establish a constructive price.

Second, the evidence clearly indicates that the paper company market was severely limited in size. The taxpayers' combined annual kilnstone output of about 350,000–400,000 tons could obviously not have been absorbed by the paper market and of course the same is true of the substantially larger kilnstone output of all Northwestern Ohio operators.

Finally, the paper company market was characterized by inelastic demand. A decrease in price would not produce corresponding proportional increases in sales. This is one more indication of the unrepresentativeness of the $1.79 figure.

The government argues for three size classifications for which, it is contended, representative field or market prices may be established: (1) the larger sizes of crushed stone commonly used in making burnt lime; (2) smaller sizes such as those used by Ohio Lime to make dead burned dolomite; and (3) the "screenings" employed in Ohio Lime's dried stone plant and Woodville's fertilizer division.

The government's expert economist testified that in his opinion the blast furnace flux market yields representative field or market prices for the taxpayers' kilnstone. Stone used by pig iron producers as flux in their blast furnaces has a top size of 4 inches, bottom size 2 inches. Prices obtained in Northwestern Ohio for blast furnace flux for the years in question varied from 95¢ to $1.43 per ton. A weighted average price computation for each of the years in question yields the following prices:

Weighted Average Prices for Blast Furnace
Dolomite in Northwestern Ohio

| Year | Weighted Average Price |
|------|------------------------|
| 1951 | $ .962 |
| 1952 | .964 |
| 1953 | .992 |
| 1954 | 1.043 |
| 1955 | 1.062 |
| 1956 | 1.132 |
| 1957 | 1.127 |

The Court is of the opinion that the foregoing prices are representative of the prices the taxpayers would have obtained in the years in question if they had marketed their kilnstone output. This conclusion is based on the following findings which are adequately supported by evidence introduced at trial: (1) stone from 2 to 9 inches in size is sufficiently homogeneous that it may be considered as one product for the purpose of establishing a market; (2) the above weighted average prices are competitive prices computed from sales data gathered from many firms, thus minimizing any special pricing factors; and (3) those prices were established in markets which were large enough to absorb the taxpayers' kilnstone output.[10]

Taxpayers protest the selection of only the blast furnace flux market for representative prices when the same size stone was sold at higher prices in the construction stone market. Woodville, for instance, made sales of minus 4 inch, plus 2 inch stone for construction purposes at

10. In fact, in the opinion of the government's expert economist the blast furnace flux market is large enough to absorb the total Northwestern Ohio kilnstone output without an appreciable decrease in market price.

a price of $1.35 per ton in each of the years in question. However, it is clear from the testimony of various producers that the construction stone market is not a competitive market. Due to high transportation costs there exists spatial monopolies in the construction stone market. Prices established in this market are therefore not competitive and consequently are of no aid in the establishment of representative field or market prices.

A second classification for which a market may be found is minus one inch stone. Stone of this size may be sold to steel producers as raw open hearth refractory dolomite. This market has the same characteristics as those which describe the blast furnace flux market, namely, homogeneity of product, competitive prices, and a market large enough to absorb the taxpayers' output of this size stone. Ohio Lime's dead burned refractory feed is included in this size category.

The following figures represent the weighted average prices for raw open hearth refractory sold by Northwestern Ohio producers:

Weighted Average Prices for Raw Open Hearth
Dolomite in Northwestern Ohio

| Year | Weighted Average Price |
| --- | --- |
| 1951 | $1.094 |
| 1952 | 1.068 |
| 1953 | 1.121 |
| 1954 | 1.149 |
| 1955 | 1.178 |
| 1956 | 1.253 |
| 1957 | 1.263 |

The Court is of the opinion that the foregoing prices are representative of the prices which Ohio Lime would have obtained in the years in question if it had marketed the stone transferred to the wet side of its screen house.

The third classification proposed by the government would include the —³⁄₁₆ inch material that Ohio Lime transferred to its dryers and the —⅛ inch material that Woodville transferred to its fertilizer division. The quantities involved ranged during the years in question from 100,000 to 170,000 tons per year for Ohio Lime and 5,800 to 7,000 tons per year for Woodville.

The government's expert economist did not have a firm recommendation as to the representative price to be assigned to the taxpayers' screenings but concluded that the maximum possible representative price is the weighted average price for raw open hearth refractory dolomite. The taxpayers, consistent with their contention that the cut-off point lies beyond the drying process, argue for the use of prices based on their dried stone sales. Such prices of course are no aid in determining the representative market price for screenings prior to the drying process.

The Court is of the view that the weighted average raw open hearth refractory dolomite prices set forth above reasonably approximate the prices which the taxpayers would have received if they had marketed their screenings before the drying process.

IV. EXEMPT EXCESS OUTPUT

When auditing Ohio Lime's tax returns the Commissioner of Internal Revenue failed to object to the taxpayer's claim of an exempt excess output credit granted for excess profits tax purposes to producers of chemical or metallurgical grade limestone. Internal Revenue Code of 1939, section 453(a) (13). The

government has raised this point by means of an offsetting defense in its amended answer.

The decision of this Court of September 25, 1963 that Ohio Lime's mineral product is dolomite rather than metallurgical or chemical grade limestone as those terms appear in section 114 of the Internal Revenue Code of 1939 disposes of any question regarding the meaning and applicability of the term "metallurgical grade limestone, chemical grade limestone" as employed in Section 453 of the Internal Revenue Code of 1939. They are the same terms, employed in the same Act, and they have the same meaning and therefore, should recomputation of Ohio Lime's tax liability for the years 1950 through 1953 result in a refund, the government will be entitled to its offset.

The government will submit to the Court and serve on the taxpayers a re-computation of the taxpayers' liability in accordance with the findings expressed in this opinion within 20 days. The taxpayers will have 10 days thereafter to oppose the details of such proposed re-computation. This opinion will serve as findings of fact and conclusions of law.